OPINION
{¶ 1} Appellant, Charles A. Maloney, appeals from the May 15, 2007 judgment entry of the Chardon Municipal Court, which convicted and sentenced him for driving under the influence of alcohol. For the following reasons, we affirm.
 {¶ 2} Substantive and Procedural History
 {¶ 3} On July 29, 2006, at approximately 11:30 p.m., David Peterson ("Mr. Peterson"), a dispatcher for the Geauga County Sheriffs Office as well as a paramedic and firefighter, was on-duty in his capacity as captain of the Montville Volunteer Fire *Page 2 
Department. Mr. Peterson was speaking to a fellow paramedic and firefighter, Mr. Ben Vendocus ("Mr. Vendocus"), outside, when they observed a vehicle come to a stop in the middle of the road in front of the station. They observed a male, who appeared to be of middle-age with gray hair, get out of the vehicle and vomit on the side of the road. The male then returned to the vehicle, drove a couple hundred yards and then again pulled the vehicle over and proceeded to vomit on the side of the road.
 {¶ 4} Concerned for the man's safety, Mr. Peterson and Mr. Vendocus decided to follow the vehicle. The man traveled southbound on Rt. 528, at which time Mr. Peterson observed the vehicle travel at varying excess rates of speed of fifty to sixty-five miles per hour in forty-five to fifty-five mile per hour zones. The vehicle erratically crossed the yellow line four to five times, and then crossed over to the right side of the lane several times, crossing over into the "buggy" lane that is reserved for horses.
 {¶ 5} While following the vehicle, Mr. Peterson called the Geauga County Sheriff's Department and reported to dispatch his observations, the vehicle information, and the registration of the car. Dispatch responded that a deputy was on the way, but to stay on the line. Mr. Peterson continued to hold on the line with dispatch and relay his observations until he saw Sergeant Gallowan, Jr. ("Sergeant Gallowan") pull the vehicle over, at which time he and Mr. Vendocus drove away.
 {¶ 6} Just prior to receiving the call from dispatch regarding Mr. Peterson's tip, Sergeant Gallowan was flagged down by passing motorists. The couple reported that they had observed an erratic driver traveling at high rates of speed southbound on Rt. 528. They gave a description of the vehicle and driver, and further informed him that they observed the motorist pull over and vomit on the side of the road. *Page 3 
 {¶ 7} Sergeant Gallowan then received the dispatch relaying Mr. Peterson's tip and proceeded to locate the vehicle. Sergeant Gallowan never saw Mr. Peterson or spoke to him directly during the incident but was aware that Mr. Peterson was the informant. Sergeant Gallowan identified the vehicle and followed it into a subdivision in Middlefield Village. He observed no traffic violations. Rather, the driver drove within the lanes of travel, utilized his traffic signal, and then turned properly into the subdivision.
 {¶ 8} Sergeant Gallowan pulled over the driver, who was identified as appellant ("Mr. Maloney"), three or four driveways past the entrance of the subdivision. He informed Mr. Maloney that he had received reports from two motorists that his vehicle was observed driving erratically and at high rates of speed. Mr. Maloney was cooperative and provided his license, although he did have trouble initially providing his proof of insurance and registration. When Mr. Maloney responded verbally, Sergeant Gallowan smelled the odor of alcohol emanating from his person, and further, observed vomit on Mr. Maloney's left leg, which prompted him to inquire as to whether Mr. Maloney was ill. Mr. Maloney responded that he believed he had contracted the "rotavirus" from his son. He also admitted to drinking a couple of beers at a golf outing earlier in the evening. Throughout the stop, Mr. Maloney was cooperative, calm, and did not slur his speech.
 {¶ 9} Sergeant Gallowan then ran Mr. Maloney's information through dispatch. When he returned, he asked Mr. Maloney whether he would voluntarily submit to field sobriety tests. Mr. Maloney cooperatively agreed. He asked Mr. Maloney to exit his car and then administered the Horizontal Gaze Nystagmus Test ("HGN"), where he observed six clues of intoxication, or rather, three clues per eye; a portable breath *Page 4 
testing device, in which Mr. Maloney blew a .134; a walk and turn test, where Sergeant Gallowan observed three out of eight clues of intoxication; and the one-leg stand, where he also observed possible clues of intoxication. After Mr. Maloney failed the sobriety tests, Sergeant Gallowan arrested him and transported him to the Geauga County sheriff's station. A BAC test was administered in which Mr. Maloney blew a .122.
 {¶ 10} Mr. Maloney was subsequently charged on August 1, 2006, with driving under the influence of alcohol, in violation of R.C.4511.19(A)(1)(a) and for driving with a concentration of eight-hundredths of one gram or more but less than seventeen-hundredths of one gram by weight of alcohol per two hundred ten liters of the person's breath, in violation of R.C. 4511.19(A)(1)(d). Mr. Maloney pled not guilty at his arraignment on August 2, 2006.
 {¶ 11} On August 31, 2006, Mr. Maloney filed a motion to suppress, claiming that Sergeant Gallowan did not have a reasonable suspicion to perform an investigatory traffic stop; that he did not have a reasonable suspicion to continue to detain Mr. Maloney and perform field sobriety tests; that the field sobriety tests were not administered in substantial compliance with standardized testing procedures; and further, that there was insufficient probable cause to make an arrest. After a hearing on February 5, 2007, the trial court denied Mr. Maloney's motion to suppress.
 {¶ 12} In a judgment entry filed April 9, 2007, the trial court found that the initial traffic stop of Mr. Maloney was not unlawful as Sergeant Gallowan was responding to information he received from a reliable informer. The trial court further found that the continued detention was not unlawful as Sergeant Gallowan had personally observed vomit on Mr. Maloney's left leg and that Mr. Maloney had trouble retrieving his *Page 5 
registration and proof of insurance. Furthermore, Sergeant Gallowan personally detected the odor of alcohol emanating from his person. Mr. Maloney also admitted to drinking a couple of beers that evening. The court then determined that probable cause existed for Mr. Maloney's arrest in that he displayed six out of six clues during a HGN test, three out of eight clues during the walk and turn, and registered a breath alcohol reading of .134 on the portable breath test machine. The court further found by clear and convincing evidence that Sergeant Gallowan had administered the field sobriety tests in substantial compliance with testing standards.
 {¶ 13} Subsequently, on May 15, 2007, Mr. Maloney pled guilty to one count of driving under the influence of alcohol in violation of R.C. 4119.19(A)(1)(a). He was sentenced to one hundred and eighty days of jail, with one hundred and seventy-seven days suspended, and ordered to pay a fine of $500. He was also ordered to undergo a seventy-two hour intervention program, and was placed on limited probation. His driver's license was suspended with limited driving privileges for one year. Mr. Maloney filed this appeal on June 14, 2007, and a motion to stay his sentence on July 2, 2007, which the trial court granted on the same day.
 {¶ 14} Mr. Maloney raises three assignments of error in this appeal:
 {¶ 15} "[1.] Whether the Trial Court erred in finding that the arresting officer had reasonable suspicion based upon ariculable [sic] facts when viewed in light of the totality of circumstances to conduct an investigatory stop.
 {¶ 16} "[2.] Whether the Trial Court erred in finding that the arresting officer had probable cause based [on] [sic] articulable facts to continue to detain Appellant or to conduct `field sobriety tests.' *Page 6 
 {¶ 17} "[3.] Whether the Trial Court erred in finding that the arresting officer in conducting the field sobriety tests complied with standardized testing procedures as prescribed by law."
 {¶ 18} Motion to Suppress Standard of Review
 {¶ 19} "At a hearing on a motion to suppress, the trial court functions as the trier of fact, and, therefore is in the best position to weigh the evidence by resolving factual questions and evaluating the credibility of any witnesses." State v. McGary, 11th Dist. No. 2006-T-0127, 2007-Ohio-4766, ¶ 20, citing State v. Molek, 11th Dist. No. 2001-P-0147, 2002-Ohio-7159, ¶ 24, citing State v. Mills (1992),62 Ohio St.3d 357, 366; see, also, State v. Mustafa, 11th Dist. No. 2000-P-0116, 2001-Ohio-7067, 3-4. "Thus, `[a]n appellate court must accept the findings of fact of the trial court as long as those findings are supported by competent, credible evidence.'" Id., citing State v.Retherford (1994), 93 Ohio App.3d 586, 592; City of Ravenna v.Nethken, 11th Dist. No. 2001-P-0040, 2002-Ohio-3129, ¶ 13. "After accepting such factual findings as true, the reviewing court must then independently determine, as a matter of law, whether or not the applicable legal standard has been met." Id.
 {¶ 20} Reasonable Suspicion to Conduct an Investigatory Stop
 {¶ 21} In his first assignment of error, Mr. Maloney contends that the trial court erred in finding that sufficient reasonable suspicion existed to conduct an investigatory stop. Specifically, Mr. Maloney contends that there were insufficient articulable facts when viewed in light of the totality of the circumstances since Sergeant Gallowan did not personally observe erratic driving nor personally observe the informant, Mr. Peterson. We find these contentions to be without merit. *Page 7 
 {¶ 22} "Initially, a law enforcement officer may momentarily stop and detain an individual without a warrant (a Terry stop) when the officer has a reasonable suspicion based on specific, articulable facts that criminal activity has just occurred or is about to take place."State v. Evans (1998), 127 Ohio App. 3d 56, 60, citing Terry v.Ohio (1968), 392 U.S. 1. "This is an exception to the warrant requirement under the Fourth Amendment. Id. Whether police have a `reasonable suspicion' is gleaned from considering the totality of the circumstances." State v. Andrews (1991), 57 Ohio St.3d 86, 87.
 {¶ 23} Further, "[w]hen a police officer bases his initialTerry stop solely upon a radio dispatch or broadcast, the Supreme Court of the United States has held that so long as the factual basis for the dispatch is proven, after a challenge thereto has been lodged, the stop is constitutionally justified." Id., citing U.S. v. Hensley (1985),469 U.S. 221.
 {¶ 24} Accordingly, this court has held that "when a Terry stop is predicated solely upon a radio dispatch or similar broadcast and that stop is later challenged in court, the state bears the burden to show the factual basis for the dispatch and stop." Id. 10-11.
 {¶ 25} The Supreme Court of Ohio one year later affirmed our reasoning in Evans, supra, in City of Maumee v. Weisner (1999), 87 Ohio St.3d 295, holding that "[w]here an officer making an investigative stop relies solely upon a dispatch, the state must demonstrate at a suppression hearing that the facts precipitating the dispatch justified a reasonable suspicion of criminal activity." Id. at paragraph one of the syllabus. Fundamentally, the Supreme Court of Ohio determined that "[a] telephone tip *Page 8 
can, by itself, create reasonable suspicion justifying an investigatory stop where the tip has sufficient indicia of reliability."
 {¶ 26} The state demonstrated at the suppression hearing that the facts precipitating the dispatch justified a reasonable suspicion of criminal activity based on a reliable informant. Relating to the reliability of informants, the Supreme Court of Ohio remarked inWeisner: "[w]e believe that greater credibility may be due an informant * * * who initiates and permits extended police contact rather than one who phones in a tip and retreats from any further police interaction. Accordingly, we consider the citizen informant to have identified himself sufficiently to accord him greater reliability than an anonymous informant." Id. at 302.
 {¶ 27} In this case, Sergeant Gallowan had two different informants report that a motorist matching Mr. Maloney's description and vehicle was erratically driving at high rates of speed down the highway. Further, both reported that they had observed Mr. Maloney pull the vehicle over to vomit on the side on the road, clearly indicating that this matter deserved further investigation, not only for the possibility of intoxication, but also out of concern for Mr. Maloney's well-being.
 {¶ 28} Not only was Sergeant Gallowan personally familiar with Mr. Peterson's identity as a fellow employee of the Geauga County Sheriff's Department, but Mr. Peterson, who is also a paramedic and firefighter, continued to stay on the line with dispatch until Mr. Maloney was ultimately pulled over. While Mr. Peterson followed Mr. Maloney, he provided dispatch with the vehicle registration and gave a firsthand account of his observations as they were occurring. Moreover, a passing vehicle also flagged Sergeant Gallowan, gave a description of Mr. Maloney's vehicle, and reported *Page 9 
his erratic driving and vomiting. See Evans at 62; State v.Claiborne (Jan. 24, 1997), 2d Dist. No. 15964, 1997 Ohio App. LEXIS 195, 10 (stating "a citizen informant who is a victim of or witness to a crime is presumed reliable").
 {¶ 29} Thus, the trial court properly determined that Mr. Peterson was a known and reliable informant. Although Sergeant Gallowan did not personally observe or speak to Mr. Peterson during the incident, Sergeant Gallowan was aware that Mr. Peterson was the informant in this case. Furthermore, Mr. Peterson's observations were confirmed when Sergeant Gallowan noticed vomit on Mr. Maloney's left leg and an odor of alcohol emanating from his person.
 {¶ 30} As the Supreme Court of Ohio stated so aptly inWeisner: "[t]aken together, these factors persuade us that the informant's tip is trustworthy and due significant weight. The informant was an identified citizen who based his knowledge of the facts he described upon his observations as the events occurred. As a result, his tip merits a high degree of credibility and value, rendering it sufficient to withstand the Fourth Amendment challenge without independent police corroboration. Accordingly the dispatch based upon this tip was issued on sufficient facts to justify [the officer's] investigative stop." Id. at 302-303.
 {¶ 31} Thus, under the facts of this case, sufficient, articulable factors existed under the totality of the circumstances to warrant an investigatory stop.
 {¶ 32} Mr. Maloney's first assignment of error is without merit.
 {¶ 33} Probable Cause to Detain
 {¶ 34} In his second assignment of error, Mr. Maloney contends that the articulable facts in this case are insufficient to support a finding of probable cause to *Page 10 
detain and conduct field sobriety tests. For the following reasons, we find these contentions to be without merit.
 {¶ 35} Having established that Sergeant Gallowan had a reasonable suspicion to conduct an investigatory stop, we turn to whether sufficient probable cause existed to detain Mr. Maloney and administer field sobriety tests.
 {¶ 36} "An officer may not expand the investigative scope of the detention beyond that which is reasonably necessary to effectuate the purposes of the initial stop unless any new or expanded investigation is supported by a reasonable, articulable suspicion that some further criminal activity is afoot." State v. Seal, 11th Dist. No. 2003-L-163,2004-Ohio-5938, ¶ 21, citing State v. Vanderhoff (1995),106 Ohio App. 3d 21, 26, quoting State v. Retherford, 93 Ohio App.3d at 600; see, also, State v. Waldroup (1995), 100 Ohio App. 3d 508, 513, citingState v. Myers (1990), 63 Ohio App.3d 765, 771. ("If during the scope of the initial stop an officer encounters additional specific and articulable facts which give rise to a reasonable suspicion of criminal activity beyond that which prompted the stop, the officer may detain the vehicle and driver for as long as the new articulable and reasonable suspicion continues.")
 {¶ 37} In this case, the articulable suspicion which prompted the investigatory stop was never dispelled. Rather, upon confronting Mr. Maloney, Sergeant Gallowan was presented with factors that confirmed both informants' reports. That is, when Sergeant Gallowan approached Mr. Maloney, he noticed vomit on Mr. Maloney's left leg and an odor of alcohol emanating from his person. He had trouble producing his registration and insurance information and openly admitted to drinking several alcoholic beverages earlier in the evening. Thus, specific and articulable facts in this case arose *Page 11 
that confirmed the need for an investigatory stop, and indeed, called for further investigation by inquiring as to whether Mr. Maloney would voluntarily submit to field sobriety tests.
 {¶ 38} "Because this is a greater invasion of an individual's liberty interest than the initial stop, the request to perform these tests must be separately justified by specific, articulable facts showing a reasonable basis for the request." Evans at 62, citing State v.Yemma, (Aug. 9, 1996), 11th Dist. No. 95-P-0156, 1996 Ohio App. LEXIS 3361. "Although the facts that served as the impetus for the stop may also assist in providing this separate justification, additional articulable facts are necessary." Id. at 62-63.
 {¶ 39} Thus, "[o]nce the officer has stopped the vehicle for some minor traffic offense and begins the process of obtaining the offender's license and registration, the officer may then proceed to investigate the detainee for driving under the influence if he or she has a reasonable suspicion that the detainee may be intoxicated based on specific and articulable facts, such as where there were clear symptoms that the detainee is intoxicated." Id., citing Yemma at 8.
 {¶ 40} Clearly, there were corroborating factors that arose after the stop that confirmed the informants' reports and that called for further investigation. Moreover, these factors of an alcoholic odor, vomit on his person, and his trouble procuring his vehicle registration were "clear symptoms" that Mr. Maloney was intoxicated and that field sobriety tests should be administered.
 {¶ 41} Mr. Maloney's second assignment of error is without merit.
 {¶ 42} Substantial Compliance of Field Sobriety Tests *Page 12 
 {¶ 43} In his third assignment of error, Mr. Maloney contends that the trial court erred in finding that the field sobriety tests were conducted in accordance with standardized testing procedures as prescribed by law. Specifically, Mr. Maloney argues that Sergeant Gallowan failed to conduct the field sobriety tests in substantial compliance with the National Highway Traffic Safety Administration's Standardized Field Sobriety Testing Manual ("NHTSA"). We find this argument to be without merit.
 {¶ 44} "Under amended R.C. 4511.19, effective April 9, 2003, an arresting officer is no longer required to administer field sobriety tests in strict compliance with testing standards for the test results to be admissible. Rather, only substantial compliance is required."State v. Barnett, 11th Dist. No. 2006-P-0117, 2007-Ohio-4954, ¶ 18, citing State v. Brown, 166 Ohio App.3d 638, 2006-Ohio-1172.
 {¶ 45} R.C. 4511.19(D)(4)(b) provides in relevant part:
 {¶ 46} "In any criminal prosecution * * * for a violation of division (A) or (B) of this section, * * * if a law enforcement officer has administered a field sobriety test to the operator of the vehicle involved in the violation and if it is shown by clear and convincing evidence that the officer administered the test in substantial compliance with the testing standards for any reliable, credible, and generally accepted field sobriety tests that were in effect at the time the tests were administered, including, but not limited to, any administration, all of the following apply:
 {¶ 47} "(i) The officer may testify concerning the results of the field sobriety test so administered.
 {¶ 48} "(ii) The prosecution may introduce the results of the field sobriety test so administered as evidence in any proceedings in the criminal prosecution * * *. *Page 13 
 {¶ 49} "(iii) If testimony is presented or evidence is introduced under (D)(4)(b)(i) or (ii) of this section and if the testimony or evidence is admissible under the Rules of Evidence, the court shall admit the testimony or evidence and the trier of fact shall give it whatever weight the trier of fact considers to be appropriate."
 {¶ 50} Thus, "[a] necessary precondition for an officer testifying concerning the results of field sobriety tests or the introduction of the results into evidence is substantial compliance with any testing standards set by the NHTSA. A trial court must accordingly determine, before the evidence is admitted, whether the results were obtained in substantial compliance with the standards of the NHTSA." State v.May, 11th Dist. No. 2005-A-0011, 2006-Ohio-3406, ¶ 29.
 {¶ 51} Further, "[t]he state may demonstrate substantial compliance with the NHTSA standards `through competent testimony and/or introducing the applicable portions of the NHTSA manual. * * *" Barnett at ¶ 22, citing State v. Djisheff, 11th Dist. No. 2005-T-0001, 2006-Ohio-6201, ¶ 19.
 {¶ 52} In this case, the state submitted both the NHTSA manual and competent testimony by the arresting officer, Sergeant Gallowan. After examining the evidence, the trial court properly determined that "[t]he state established by clear and convincing evidence a proper foundation as to Sergeant Gallowan's training and ability to administer both the horizontal gaze nystagamus standardized field sobriety test, and the walk and turn standardized field sobriety test, and further established by clear and convincing evidence that the actual technique used by Sergeant Gallowan in administering said standardized field sobriety tests was in substantial compliance with *Page 14 
the testing standards for reliable, credible and generally accepted field sobriety testing in effect at the time said tests were administered by him."
 {¶ 53} A review of the record reveals that the state introduced the NHTSA manual as established standards, as well as laid a proper foundation of Sergeant Gallowan's expertise and training. Specifically, Sergeant Gallowan testified as to the tests he conducted and how he administered them with Mr. Maloney. Sergeant Gallowan explained the instructions and demonstrated each test he conducted, which included the HGN test, the portable breathalyzer test, the walk and turn test, and the one-leg stand. He further testified that he performed these tests consistent with the requirements of the NHTSA manual. Moreover, Sergeant Gallowan testified on cross-examination that his training was based on the NHTSA standards and again reviewed the instructions and demonstrated each test given.
 {¶ 54} Specifically, Mr. Maloney argues that the HGN test was not administered per NHTSA standards since Sergeant Gallowan did not have Mr. Maloney remove his contact lenses, and did not use the testing instrument (Sergeant Gallowan's finger) at varied speed when moving his finger in front of Mr. Maloney's eyes. He further argues that the walk and turn test was also improperly administered since Sergeant Gallowan did not instruct Mr. Maloney verbatim from the NHTSA manual; that he did not demonstrate the proper way for Mr. Maloney to pivot; and further, that the test was performed on an uneven, curvy road. In addition, Mr. Maloney asserts that the one-leg stand was also improperly administered. Since the trial court made no mention of the one-leg test in its findings, and thus, presumably did not include the results of the test in *Page 15 
reaching its conclusion that sufficient probable cause existed to arrest Mr. Maloney for driving while intoxicated, we will not consider that test now on appeal.
 {¶ 55} The standard for field sobriety tests is not that they be administered in strict compliance with NHTSA standards, but rather in substantial compliance. Thus, a rigid, exact adherence to the NHTSA manual is not required, albeit the tests must still "substantially comply" with the standards. However, in this case, none of the errors asserted rise to the level of drawing a conclusion that the field sobriety tests were not conducted in substantial compliance with NHTSA standards.
 {¶ 56} Although Sergeant Gallowan did not repeat the instructions verbatim from the NHTSA manual, the instructions given were comparable and paraphrased in the officer's own language. Further, during the administration of the HGN test, Sergeant Gallowan knew that Mr. Maloney was wearing contact lenses and took that into account in determining whether Mr. Maloney was displaying signs of intoxication. Moreover, Sergeant Gallowan instructed Mr. Maloney on each test, and then inquired as to whether he understood the instructions. Mr. Maloney was cooperative and performed the tests without trouble.
 {¶ 57} Mr. Maloney fails to cite with specificity which standards Sergeant Gallowan did not substantially comply with in administering these tests. "The potential compromise of reliability caused by the lack of strict compliance can be shown by the defense on cross-examination."State v. Dean, 11th Dist. No. 2007-P-0025, 2007-Ohio-6947, ¶ 39, citingState v. Boczar, 113 Ohio St.3d 148, 2007-Ohio-1251, ¶ 23. In this case no potential compromise of reliability was evidenced by the defense. *Page 16 
 {¶ 58} Even if we were to find that the HGN and walk and turn tests were not administered in substantial compliance with NHTSA standards, sufficient probable cause exists for Mr. Maloney's arrest since he displayed other factors of intoxication and tested a .134 on the portable breathalyzer test, and then tested later at the police station, a .122 on the PAC test. Moreover, the state carried its burden of proof by introducing the testimony of a competent officer and the NHTSA manual. There is nothing to indicate that the tests were administered improperly and not in substantial compliance with the NHTSA standards.
 {¶ 59} Mr. Maloney's third assignment of error is without merit.
 {¶ 60} The judgment of the Chardon Municipal Court is affirmed.
 COLLEEN MARY O'TOOLE, J., TIMOTHY P. CANNON, J., concur. *Page 1