The STATE of Ohio, Appellee,

v.

ANDREWS, Appellant.

[Cite as *State v. Andrews,* 177 Ohio App.3d 593, 2008-Ohio-3993.]

Court of Appeals of Ohio,
Eleventh District, Geauga County.

No. 2007–G–2807.

Decided July 25, 2008.

David P. Joyce, Geauga County Prosecuting Attorney, and Matthew J. Greenway, Assistant Prosecuting Attorney, for appellee.

David M. Maistros, for appellant.

TRAPP, Judge.

{¶ 1} Appellant, Phyllis J. Andrews, appeals from the October 2, 2007 judgment entry of the Geauga County Court of Common Pleas, Juvenile Division, which accepted her plea of no contest and found her guilty of one count of contributing to the delinquency to a minor, sentencing her to serve a seven-day sentence in the Geauga County Safety Center, and ordering her to pay a $250 fine. For the following reasons, we reverse and remand.

{¶ 2} *Substantive and Procedural Facts*

{¶ 3} Andrews was found guilty of one count of contributing to the delinquency of a minor, a misdemeanor of the first degree in violation of R.C. 2919.24(A)(2), following a party that involved minors drinking alcohol in her home. On the evening of May 18, 2007, the Bainbridge police responded to a call that there was a juvenile drinking party in the area. The house was quiet on their arrival. They walked to the backyard, which they found abandoned and strewn with beer cans and a burning bonfire. The officers peeked through the basement windows, observed a group of juveniles with beer cans and cups on a table nearby, and approached the front door. Sometime later, they entered Andrews's home without a warrant, and she was subsequently charged and arrested for contributing to the delinquency of a minor.

{¶ 4} On August 23, 2007, Andrews filed a motion to suppress, arguing that the evidence of underage alcohol consumption, which was obtained from the warrantless search of her residence, should be suppressed because there were no exigent circumstances that required a warrantless search of her home or seizure of her person.

{¶ 5} The hearing on her motion was held on September 7, 2007, at which time Bainbridge Officer April Kallay and Sergeant Dale Buckingham testified for the state. Officer Kallay testified that when she arrived on the scene with Sergeant Buckingham, she noticed approximately a dozen cars parked on the side of the

road. The house was dark and quiet. Notably absent was a party scene out of control. Beer cans and cups were lying around the vicinity of the vehicles, the yard, and the house.

{¶ 6} The officers then walked to the backyard, where they found the yard abandoned, with a bonfire still burning. Officer Kallay noticed that there were lights on in the back basement window, and when she peered inside, she observed several juveniles, who appeared to be drinking in the basement. Red Solo cups, beer cans, and a "beer bong" funnel were on a table.

{¶ 7} Sergeant Buckingham went to the front door and spoke with Andrews, whom he believed to be the homeowner. He advised her that they were responding to a 911 call and that there were juveniles drinking in the basement. Upon the sergeant's request for her identification, she shut the door. Sergeant Buckingham then contacted dispatch and asked them to call the home and advise Andrews that she needed to come to the door.

{¶ 8} Officer Kallay returned to the backyard and again peered into the basement window. This time, the lights were off. Officer Kallay testified that there was no discussion about any emergency or danger to the juveniles, aside from an assumption that they were drinking excessively and then would possibly drive. Her concern was that the evidence of underage drinking, such as the beer cans and funnel, would be destroyed.

{¶ 9} Sergeant Buckingham then testified that he observed approximately nine cars when he arrived on the scene, some of them with high school writing on the windows. He noticed beer cans lying in the ditch alongside the roadway. He did not enter the home when he first approached Andrews at the door in an effort to obtain her consent. After Andrews closed the door, he testified that he did not break in the door because he believed that the juveniles were confined. He "didn't have to worry about them running, harming themselves," and his belief was that he could "gain verbal consent from the homeowner."

{¶ 10} Approximately ten minutes passed until Andrews reappeared at the front door. At this time, the scene was secure, as Officer Kallay was in the backyard. Andrews unlocked the screen door and handed Sergeant Buckingham her driver's license. At that point, Sergeant Buckingham pushed past Andrews and entered the home. Andrews ran past him and slammed the basement door shut. Upon locking the basement door, Sergeant Buckingham arrested Andrews for obstructing police business and advised her verbally of her *Miranda* rights. At no time prior did Sergeant Buckingham ask for permission to enter the home.

{¶ 11} On September 11, 2007, the trial court denied Andrews's motion to suppress, finding that based upon the officers' observations and initial conversation with Andrews, the officers had probable cause to believe that she was in the

act of contributing to the delinquency of minors. The court determined that in the time it would have taken the officers to obtain a search warrant, the health and safety of the juveniles would have been at risk and that there was a substantial risk that evidence would have been destroyed or dissipated because it appeared that the juveniles were already in the process of cleaning the home when they arrived, although once the police forcibly entered the home, they failed to collect the evidence they feared would be destroyed. The court further determined that the breath and blood alcohol content of the juveniles who were allegedly drinking would have dissipated over time. In addition, the court found that Andrews was properly advised of her *Miranda* rights upon her arrest, although the court determined that issue was moot because Andrews chose to exercise her right to remain silent after being taken into custody.

{¶ 12} A change-of-plea hearing was held on October 2, 2007, at which time Andrews pleaded no contest, and the court found her guilty of one count of contributing to the delinquency of a minor in violation of R.C. 2919.24(A)(2), a misdemeanor of the first degree. Andrews was sentenced to serve seven days in the Geauga County Safety Center and was ordered to pay a $250 fine. Andrews subsequently filed and was granted a stay of sentence pending this appeal on October 19, 2007.

{¶ 13} Andrews timely appealed and raises the following assignment of error:

{¶ 14} "The trial court erred to the prejudice of the defendant-appellant by denying her motion to suppress evidence obtained by the Bainbridge police department in violation of the Fourth and Fourteenth Amendments to the United States Constitution."

{¶ 15} *Standard of Review*

{¶ 16} "At a hearing on a motion to suppress, the trial court functions as the trier of fact, and therefore is in the best position to weigh the evidence by resolving factual fact, and, therefore is in the best position to weigh the evidence by resolving factual questions and evaluating the credibility of any witnesses." *State v. Maloney*, 11th Dist. No. 2007–G–2788, 2008-Ohio-1492, 2008 WL 836414, ¶ 19, citing *State v. McGary*, 11th Dist. No. 2006–T–0127, 2007-Ohio-4766, 2007 WL 2696806, ¶ 20, citing *State v. Molek*, 11th Dist. No. 2001–P–0147, 2002-Ohio-7159, 2002 WL 31862665, ¶ 24, citing *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972; see also *State v. Mustafa* (Dec. 14, 2001), 11th Dist. 2000–P–0116, 2001 WL 1602127. "Thus, '[a]n appellate court must accept the findings of fact of the trial court as long as those findings are supported by competent, credible evidence.'" Id., citing *McGary* at ¶ 20, citing *State v. Retherford* (1994), 93 Ohio App.3d 586, 592, 639 N.E.2d 498; *Ravenna v. Nethken*, 11th Dist. No. 2001–P–0040, 2002-Ohio-3129, 2002 WL 1357782, ¶ 13. "After accepting such

factual findings as true, the reviewing court must then independently determine, as a matter of law, whether or not the applicable standard has been met." Id.

{¶ 17} *Warrantless Entry and Exigent Circumstances*

{¶ 18} In her sole assignment of error, Andrews contends that the trial court erred in denying her motion to suppress the evidence obtained from the officers' warrantless intrusion into the sanctity of her home. Specifically, Andrews argues that in order for the police to enter her home without a warrant, the officers needed both probable cause and exigent circumstances. In this case, she contends that no emergency existed when the offices forcibly entered her home without a warrant. She further argues that even if such a situation had been present, the exigent-circumstance exception to the warrant requirement applies only to felonies, and not to a misdemeanor, as was charged in this case. We find this contention to have merit since no exigent circumstances were present that would allow the officers to forgo the protections of the Fourth Amendment and invade Andrews's home without a warrant.

{¶ 19} While many words are written about the Fourth Amendment to the United States Constitution, the words and plain meaning of the amendment itself have been forgotten. The Fourth Amendment safeguards: "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, *and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.*" (Emphasis added.)

{¶ 20} The slow erosion of its protection for expediency's sake or the attitude that a warrant is just a "technicality" should be troubling to all citizens but especially to the judicial branch, which is tasked with standing as the bulwark for our constitutional rights. The founders of our democracy courageously fought a tyrant who ordered warrantless searches of their homes and shops, and they created our cherished Bill of Rights in order to "transform the aspiration for freedom and arbitrary government intrusion into the guarantees of fundamental law." Samuel Dash, The Intruders (2004), 3.

{¶ 21} Where an offense is punishable by jail or imprisonment, police may effect a warrantless entry of a home if probable cause and exigent circumstances support the intrusion. The consideration, however, of whether the alleged crime is a felony or a misdemeanor offense in this case is of no relevance because we find that no exigent circumstances existed to justify the warrantless intrusion of Andrews's home. Rather, the circumstances presented, exigent or otherwise, do not represent any exception to the warrant requirement.

{¶ 22} "In the frequently cited case of *Payton v. New York* (1980), 445 U.S. 573, 583, 100 S.Ct. 1371, 63 L.Ed.2d 639, the United States Supreme Court stated that warrantless searches and seizures inside an individual's home presumptively violate the Fourth Amendment. Indeed, the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed * * *.' *United States v. United States Dist. Ct.* (1972), 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752. However warrantless searches and seizures are not in violation of the Fourth Amendment when performed pursuant to exigent circumstances or voluntary consent. *Willoughby v. Cicek* (Mar. 18, 1994), 11th Dist. No. 92–L–203, 1994 WL 102250 * * *." *State v. Townsend* (Aug. 27, 1999), 11th Dist. No. 98–L–036, 1999 WL 689934.

{¶ 23} "The exigent circumstances exception will permit police to execute a warrantless search or seizure providing that before the search or seizure ensues, there is probable cause and the presence of an exigent circumstance." Id., citing *State v. Robinette* (1997), 80 Ohio St.3d 234, 243, 685 N.E.2d 762. "[T]he burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." Id., citing *Welsh v. Wisconsin* (1984), 466 U.S. 740, 750, 104 S.Ct. 2091, 80 L.Ed.2d 732. "The United States Supreme Court has recognized only a few emergency conditions that qualify as 'exigent circumstances.' Id. at 8, citing *Welsh* at 749–750, 104 S.Ct. 2091. Some of the current exigent circumstances include: 'hot pursuit,' imminent destruction of evidence, and ongoing fire." Id., citing *Welsh* at 750, 104 S.Ct. 2091.

{¶ 24} There is no doubt that probable cause existed for the issuance of a search warrant in this case because clearly there was evidence of underage drinking, as the officers themselves observed. Also clear, and deplorable, was the fact that an adult, Andrews, was present in the home, apparently overseeing the illegal behavior of any minor who was drinking without being accompanied by a parent or legal guardian. Thus, we understand the concern of the officers, who were confronted with a crime. Yet the crime was contained and could and should have been handled within the purview of the Fourth Amendment's prohibition against warrantless entry into one's home.

{¶ 25} The officers reported to the scene responding to a noise violation, yet by the time they arrived, the noise had ceased. In fact, when the officers approached the house, it was quiet, and there were no lights or people outside. Thus, unlike many of the cases in which a warrantless search and arrest were upheld, there were no noise or noise violations occurring. Quite simply, by the time the police arrived, the nuisance had abated, and the yard was quiet and abandoned.

{¶ 26} This case is distinguishable from those cases that hold that exigent circumstances were present where police reported to situations that called for an immediate response due to nuisance and chaotic crowds. In *State v. Namay* (Apr. 7, 2000), 106 Ohio Misc.2d 72, 735 N.E.2d 526, the officers were responding to a 911 call reporting that a large party was disturbing the neighborhood. When the officers arrived, they could hear "yelling, screaming, and profanity" coming from the home. Id. at 74, 735 N.E.2d 526. Moreover, there were over 75 people in the house who ran to the back of the home when they became alerted to the officers' presence. No one would answer the door, and no adults were present. Thus, the court held that there was a need for immediate action for three reasons, namely "the preservation of evidence, the abatement of an ongoing nuisance, and the prevention of flight." Id. at 78, 735 N.E.2d 526. In that case, the large number of people created a chaotic scene that, when combined with the nuisance, required prompt action by the police so that the scene could be secured. Those elements are largely absent from this case.

{¶ 27} In *State v. Cheadle* (July 14, 2000), 2d Dist. No. 00CA03, 2000 WL 966167, the Second Appellate District was faced with a similar situation, albeit a much noisier party scene. In that case, the court upheld the warrantless intrusion of a home solely as to one person. When the officers responding to a noise complaint arrived on the scene, they heard loud voices coming from the residence. The front door was open, and the officer recognized a young girl, "Ms. Hicks," holding and drinking from an open can of beer. The officer personally knew Hicks and that she was underage. Thus, solely as to her, the court upheld the warrantless intrusion on the basis that Hicks could easily destroy the evidence. Fundamentally, the court further held that "[t]here was, however, *no probable cause to support a further intrusion or a general exploratory search of the home for additional evidence not associated with the limited probable cause police had regarding Jessica Hicks.* * * * Therefore, the evidence obtained as result thereof was properly suppressed by the trial court." (Emphasis added.) Id. 2000 WL 966167, at *3. Thus, the court determined that exigent circumstances existed only as to Hicks and that a warrant should have been secured to further search the premises.

{¶ 28} In the present case, there were nine to 12 cars parked outside, some with indicia of the local high school painted on them. The officers walked onto Andrews's property and investigated the rear of the residence. They observed a quiet, empty backyard, with beer cans strewn over it and a bonfire still burning. The officers then peeked into the basement windows where they observed about 20 juveniles drinking from beer cans and red Solo cups, with a "beer bong" sitting on a table nearby. Most importantly, they did not observe juveniles passed out or vomiting. At no point in the officers' testimony was there any evidence of

intoxication that could support the claim that they had entered without a warrant because of an emergency.

{¶ 29} Officer Buckingham knocked on the door, and Andrews advised him that police were not allowed in her home. He requested identification, and she immediately closed and locked the door, presumably to retrieve her identification. He made no determination whether other parents were also in the home.

{¶ 30} At this point, the party was under control. No juveniles were running away, and the evidence of underage drinking was not going to disappear. Officer Kallay was in the rear of the house, observing the basement, and Officer Buckingham was on the front porch. Thus, the scene was secured to wait for further backup if need be.

{¶ 31} In *State v. Huff* (June 10, 1999), 4th Dist. No. 98 CA 23, 1999 WL 402222, in an almost apposite case, the Fourth District found the exigent-circumstances exception to the warrant requirement equally unpersuasive and cogently stated: "The reasoning behind the 'hot pursuit' exception to the warrant requirement is that a person should not be able to avoid arrest simply by fleeing *from a public place to a private place.*" (Emphasis added.) Id., 1999 WL 402222, at *5, citing *Cleveland v. Shields* (1995), 105 Ohio App.3d 118, 121–122, 663 N.E.2d 726; *State v. Lomak* (Mar. 11, 1999), 10th Dist. No. 98AP–708, 1999 WL 138603. "This exception has no bearing on the present case, however, because the suspects were already in the house. The suspects did not flee from an outside location. A 'hot pursuit' scenario simply does not exist when the suspect is already in a private dwelling. See, e.g. *State v. Howard* (1991), 75 Ohio App.3d 760, 774, 600 N.E.2d 809. Moreover, if the officers were concerned about the suspects escaping from inside, they could have stood guard at the exits to that house and achieved the same results without violating the sanctity of the residence." Id., 1999 WL 402222, at *5.

{¶ 32} As to the destruction of evidence, the court was equally unpersuaded, stating: "A warrantless entry into a residence may be justified in some circumstances in which evidence is in danger of being removed or destroyed in the amount of time it would take police to obtain a warrant. Katz, Ohio Arrest, Search and Seizure (1998 Ed.) 171, § T10.02; see, also, *State v. Hickson* (1990), 69 Ohio App.3d 278, 280, 590 N.E.2d 779. However, we cannot conclude that this was the case here. The evidence which first prompted the officers to believe that a crime was being committed was the sight of underage individuals drinking from beer cans. * * * It goes without saying that an aluminum beer can is not going to be easily disposed of as would a controlled substance or something of that nature and, even if it could, that disposal would not alter the fact that the officers had seen them and could testify to their existence." Id., 1999 WL 402222 at *6.

{¶ 33} Moreover, it is important to note that the offense in this case, contributing to the delinquency of a child, does not require a certain alcohol content threshold to be reached for Andrews to be convicted. Surely the destruction of the party supplies was not so imminent that it supported a warrantless search. Indeed, Officer Buckingham testified that he did not even collect the very cans, cups, and beer bong he feared would be destroyed when he did enter the home without a warrant.

{¶ 34} Equally unpersuasive is the argument that the warrant would cause undue delay, as one officer testified, based upon one experience that it would take over four hours to secure a warrant. The Sixth District, in a similar case, *State v. Davis* (1999), 133 Ohio App.3d 114, 726 N.E.2d 1092, artfully reasoned that "the citizens of this country and this state are entitled to the protection afforded by their constitutional rights at all times, not just when it is convenient or when the duty rosters of police departments are sufficient. Furthermore, a warrantless entry of a home by police officers cannot be justified by exigent circumstances of their own making." Id. at 119–120, 726 N.E.2d 1092, citing *State v. Jenkins* (1995), 104 Ohio App.3d 265, 272, 661 N.E.2d 806.

{¶ 35} Finally, the officer failed to determine whether the parents or legal guardians of the minors were also in attendance at the party, as R.C. 4301.69(E)(1) provides: "No underage person shall knowingly order, pay for, share the cost of, attempt to purchase, possess, or consume any beer or intoxicating liquor in any public or private place. * * * The prohibitions set forth * * * of this section against an underage person * * * shall not apply if the underage person is accompanied by a parent, * * * or legal guardian * * *." Indeed, if each minor's parent had been in attendance, no crime would have been committed.

{¶ 36} Surely, there was an obvious, concerted effort to hide the party. Once the juveniles were confined to the basement, they even shut off the lights when they became aware that officers were peeking through the basement windows. That does not change the fact that the officers had the scene secured, that the party was controlled as all the juveniles were confined to the basement, and that Andrews was responding to the officer's request in handing him her identification. The officer, however, ignored her identification and decided to push his way through the entry instead.

{¶ 37} The conduct of Andrews and the conduct of the police in this case are in diametric contradiction to the expectation we have of adults supervising other parents' minors and law enforcement operating within the constitutional constructs. The inexplicable conduct of a parent hosting a drinking party for minors is juxtaposed with the equally inexplicable conduct of the officer who said: "It

never entered my mind to obtain a warrant because, I mean, we have juveniles actively drinking in the basement."

{¶ 38} Pundits bemoan reversals of convictions based upon a "technicality." But as Justice Clark so eloquently explained in the landmark decision in *Mapp v. Ohio* (1961), 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081: "There are those who say, as did Justice (then Judge) Cardozo, that under our constitutional exclusionary doctrine '[t]he criminal is to go free because the constable has blundered.' *People v. Defore* [(1926)], 242 N.Y. [13], 150 N.E. 585, 587. In some cases this will undoubtedly be the result. But, as was said in *Elkins* [ (1960), 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669] 'there is another consideration—the imperative of judicial integrity.' Id. at 222, 80 S.Ct. 1437, 4 L.Ed.2d 1669. The criminal goes free, if he must, but it is the law that sets him free. Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence. As Mr. Justice Brandeis, dissenting, said in *Olmstead v. United States* (1928), 277 U.S. 438, 485, 48 S.Ct. 564, 72 L.Ed. 944: 'Our government is the potent, the omnipresent teacher. For good or ill, it teaches the whole people by its example. * * * If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.' " Id. at 659, 81 S.Ct. 1684.

{¶ 39} Thus, we cannot uphold a determination that the state proved sufficient exigent circumstances that would sanction a warrantless intrusion into the sanctity of someone's home under the circumstances of this case. For that reason, we find Andrews's assignment of error to have merit and that the motion to suppress should have been granted.

{¶ 40} The judgment of the Geauga County Common Pleas Court, Juvenile Division, is reversed, and the cause is remanded in accordance with this opinion.

Judgment reversed<br>and cause remanded.

CANNON, J., concurs.

GRENDELL, P.J., dissents.

CANNON, Judge, concurring.

{¶ 41} I concur in the majority's opinion.

{¶ 42} In the instant case, appellant was charged with contributing to the delinquency of a child, a misdemeanor of the first degree. While I recognize the great concern for the problems associated with contributing to inappropriate underage drinking, I must also recognize the rights afforded to an individual, secure in the environment of his or her home, by the Fourth Amendment.

Without first obtaining a warrant, the police officer who forces entry into a home must conduct himself within an exception to the Fourth Amendment warrant requirement in order to withstand a proper challenge. The exception at issue in this case is exigent circumstances. (Citations omitted.) *State v. Scharf,* 11th Dist. No. 2003–L–203, 2005-Ohio-4206, 2005 WL 1940361, at ¶ 23.

{¶ 43} "[E]xigent circumstances exist where 'there is such a *compelling necessity for immediate action* as will not brook the delay of obtaining a warrant.'" (Emphasis added.) *State v. Martin,* 1st Dist. No. C–040150, 2004-Ohio-6433, 2004 WL 2757604, at ¶ 19, quoting *United States v. Adams* (C.A.1, 1980), 621 F.2d 41, 44. While I emphasize that I do not wish to impede an officer's duties to enforce the laws against underage drinking, there is simply not enough evidence in the record to indicate the existence of sufficient exigent circumstances to validate a warrantless forced entry and search of appellant's home. As stated in the majority opinion, the police officers had secured the scene; no juveniles were attempting to flee the scene; the destruction of evidence was not imminent; and an emergency situation was not present. Further, there was no evidence that any person in the home was in danger or physically ill. Therefore, without the consent of appellant and without exigent circumstances, the entry into appellant's home constituted an unreasonable, warrantless entry in violation of the Fourth Amendment to the United States Constitution.

{¶ 44} The majority opinion also indicates that there is no need to address the fact that the instant offense is a misdemeanor versus a felony, because there were no "exigent circumstances" to justify the intrusion. I, however, believe the fact that the instant offense is a misdemeanor charge is of particular importance, because it is a factor to consider in making the assessment of whether exigent circumstances exist. I would want nothing in this decision to deter an officer from exercising his duty if he clearly observes a serious misdemeanor offense or an offense of violence, or if he has other good cause to make an intrusion.

{¶ 45} I concur that it is also important to note that the police officers, at no time, asked appellant if any of the minors' parent(s) or legal guardian(s) were present in the house. This is of particular concern because pursuant to R.C. 4301.69(E)(1), an underage individual may consume alcohol "if the underage person is supervised by a parent * * * or legal guardian." Certainly, this would have been an appropriate inquiry by the police officers because the presence of the minors' parent(s) or legal guardian(s) could negate the commission of any violation at all.

{¶ 46} I believe this decision is in complete accord with the Fourth District's holding in the case cited in the majority opinion, *State v. Huff* (June 10, 1999), 4th Dist No. 98 CA 23, 1999 WL 402222.

{¶ 47} Therefore, based on the foregoing, I concur that the trial court erred in denying appellant's motion to suppress evidence obtained by the Bainbridge Police Department.

GRENDELL, Presiding Judge, dissenting.

{¶ 48} Contrary to the majority's opinion, the case before us is not an example of overreaching police officers violating a citizen's aspirations for freedom from arbitrary government intrusion. On the contrary, the police were summoned to Lake on the Woods Trail because of a citizen's complaint about an "enormous" underage drinking party. Upon arrival, the police found evidence that the complaint was justified and observed crimes being committed in Andrews's home. The officers entered the home to make arrests and to stop the illegal activity from continuing. Because the officers' conduct was reasonable in light of the surrounding circumstances, I respectfully dissent and would uphold the trial court's denial of Andrews's motion to suppress.

{¶ 49} The majority seeks to justify its legal conclusions by relying upon its particular characterization of the evidence, despite this court's limited mandate to "review the trial court's findings of fact only for clear error and give due weight to inferences the trial judge drew from the facts." *State v. Hummel*, 154 Ohio App.3d 123, 2003-Ohio-4602, 796 N.E.2d 558, at ¶ 11.

{¶ 50} The majority states that the officers were responding to a "noise violation" that had ceased by the time they arrived ("the nuisance had abated, and the yard was quiet and abandoned").

{¶ 51} The officers' suppression-hearing testimony did not refer to "noise," but rather, to an "enormous juvenile party" involving the consumption of alcohol. It is worth noting that underage drinking is a crime, rather than a nuisance.

{¶ 52} The first officers to respond, in whose "zone" Lake on the Woods Trail is located, did not find the scene "quiet and abandoned." They encountered two young men standing in the roadway. After giving chase, the initial officers apprehended one of the suspects, whom they determined to be a juvenile who had been consuming alcohol. These initial officers took the suspect to the station and were not available to assist the other arriving officers.

{¶ 53} When Sergeant Buckingham and Officer Kallay arrived, there were no longer any juveniles outside. As noted by the majority, the officers found abundant evidence of a juvenile drinking party: beer cans strewn along the road and driveway; cars with high school graffiti; and an unattended, actively burning bonfire surrounded by chairs and more beer cans.

{¶ 54} Nor had the drinking party ceased. Officer Kallay testified that she observed about 20 juveniles in Andrews's basement drinking from bottles and red

plastic cups. Officer Kallay also observed a "beer bong" used for the rapid consumption of alcohol.

{¶ 55} The majority cites *State v. Huff* (June 10, 1999), 4th Dist. No. 98 CA 23, 1999 WL 402222, an "almost apposite case," for the proposition that the "hot pursuit" exception to the warrant requirement does not apply when the suspects are already in the house.

{¶ 56} *Huff* is completely inapposite to this case. In *Huff*, the police responded to a dispatch reporting possible domestic violence. Upon their arrival, they found no evidence of domestic violence at the suspected residence. The officers then noticed a group of young people sitting inside the house next door, drinking beer and playing cards. The officers then entered the neighboring home and conducted sobriety tests. Id.

{¶ 57} In *Huff*, the officers were responding to a report of domestic violence when they incidentally noticed evidence of underage consumption at another location. In the present case, the officers were responding to a report of an underage drinking party and found evidence of an underage drinking party. In *Huff*, there was no evidence that the juveniles had been drinking outside the residence and had fled inside at the approach of the police. In the present case, there was considerable evidence that the juveniles had been consuming alcohol outside and had quickly fled inside upon the approach of police. Contrary to the majority's position, the juveniles in the present case were not "already in the dwelling." They had fled into the dwelling to avoid the police.

{¶ 58} Accordingly, the officers were justified in effecting an entry into Andrews's home, based upon the doctrine of hot pursuit. See *Middletown v. Flinchum*, 95 Ohio St.3d 43, 44, 2002-Ohio-1625, 765 N.E.2d 330 ("a suspect may not avoid arrest simply by outrunning pursuing officers and finding refuge in her home"); *State v. Stuber*, 150 Ohio App.3d 200, 2002-Ohio-6309, 779 N.E.2d 1090, at ¶ 12 (deputies were engaged in hot pursuit of the suspect when the suspect fled from his driveway into his house upon sight of the deputies). In these circumstances, it does not matter that Sergeant Buckingham and Officer Kallay were not the first officers to respond on the scene or that they did not actually view the flight into Andrews's home. Police action had been initiated prior to the retreat into the home. *Warden v. Hayden* (1967), 387 U.S. 294, 297–298, 87 S.Ct. 1642, 18 L.Ed.2d 782 (officers justified in entering a home in which they had been advised, by dispatch, that a robber had fled); *State v. Simpson*, 5th Dist. No. 07–CA–0002, 2008-Ohio-632, 2008 WL 434984, at ¶ 7 and 15 (officers entered defendant's trailer after defendant fled the scene of an accident at which the officers were not present).

{¶ 59} A further significant distinction between the present case and *Huff* is that in *Huff*, the officers entered the residence based solely on their observations

from outside the residence. Although they knocked on the door before entering, they entered without speaking with anyone or obtaining further evidence that a crime was being committed. In the present case, the officers conducted further investigation before entering the premises. The results of this investigation confirmed their observations and provided further justification for their entry into the residence.

{¶ 60} Sergeant Buckingham knocked on the door, and Andrews answered and identified herself. Sergeant Buckingham advised Andrews that they were investigating a report of underage drinking. Andrews denied that there were juveniles drinking at her residence and told him that he could not enter her home. Sergeant Buckingham then asked for identification and advised her that he would be contacting the owners of the vehicles parked at her residence. Andrews, without speaking, "immediately closed and locked the door."

{¶ 61} The majority presumes that Andrews did so in order to retrieve her identification. Sergeant Buckingham understood Andrews's actions differently and attempted to have dispatch contact her by telephone and have her return to the door. Sergeant Buckingham also knocked on the door. About ten minutes passed before Andrews opened the door again. During this time, the lights in the basement were turned off, and the officers were no longer able to view what was going on in the house. After the lights went out, Sergeant Buckingham testified that he was concerned both for the juveniles' safety and for the destruction of evidence.

{¶ 62} The majority states that "[a]t this point, the party was under control"; no juveniles were passed out or vomiting; and aluminum beer cans are not easily destroyed. However, the officers were no longer able to monitor or control what was going on in Andrews's residence. If one of the juveniles did pass out or begin vomiting, or if they continued drinking, or if they were trying to conceal evidence, the officers could do nothing at this point without gaining entry into the home. It is not reasonable or prudent to allow this sort of situation to continue longer than is necessary. Sergeant Buckingham testified that it would have taken several hours to obtain a warrant and described the effect that alcohol can have on the juveniles' judgment. The fact that no juveniles had, as yet, tried to escape the residence and drive away does not mean that this was not a possibility. Officer Kallay expressly testified that she was concerned about juveniles trying to drive away.

{¶ 63} As to the destruction of evidence, the trial court properly noted that the "breath and blood alcohol content of the juveniles who had consumed alcohol would have dissipated over time." This is the best evidence to support the charges of underage consumption of alcohol, as well as contributing to the delinquency of a minor. The police could have recovered beer cans after

obtaining a warrant, but would have faced the problem of linking those beer cans to consumption by minors, as opposed to Andrews or other adults. In any event, these are not the type of deliberations that police officers should be required to make when faced with the situation in which the safety and welfare of minors are at stake.

{¶ 64} Finally, when Andrews did open the door again to produce identification, the officers had probable cause to effect her immediate arrest for contributing to the delinquency of a minor and obstruction of justice. The officers had observed minors drinking in her home. Andrews had denied what the officers had seen, refused to speak with officers, refused to allow the officers to enter her home, and demonstrated that she would not be cooperating with their investigation.

{¶ 65} In *United States v. Santana* (1976), 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300, police officers observed a suspect "standing in the doorway" of her home as they approached. Id. at 40, 96 S.Ct. 2406. The suspect retreated into the vestibule of the house, and the police entered through the open door and arrested her therein. Id.

{¶ 66} The Supreme Court held that there was no violation of the Fourth Amendment. "While it may be true that under the common law of property the threshold of one's dwelling is 'private,' as is the yard surrounding the house, it is nonetheless clear that under the cases interpreting the Fourth Amendment [the suspect] was in a 'public' place. She was not in an area where she had any expectation of privacy. 'What a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection.' *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). She was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house. *Hester v. United States,* 265 U.S. 57, 59, 44 S.Ct. 445, 68 L.Ed. 898 (1924)." Id. at 42, 96 S.Ct. 2406.

{¶ 67} Similarly in the present case, when Andrews exposed herself to the officers' view, speech, hearing, and touch, the officers were entitled to enter the home and effect her arrest, which they did.

{¶ 68} The majority concludes by observing that when the government becomes the lawbreaker, "it breeds contempt for the law." In the present case, the government did not break the law but acted prudently and reasonably for the safety and welfare of the juveniles involved, as well as for the community. Censuring police officers for properly doing their duty creates a real danger to the rule of law.