[Cite as *State v. Lam*, 2013-Ohio-505.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                               :

     Plaintiff-Appellee               :          C.A. CASE NO.    25336

v.                                          :          T.C. NO.    11CR4263

TIMOTHY LAM                                 :          (Criminal appeal from
                                                       Common Pleas Court)

     Defendant-Appellant              :

                                            :
. . . . . . . . . .

**O P I N I O N**

Rendered on the ___15th___ day of ____February____, 2013.

. . . . . . . . . .

MICHELE D. PHIPPS, Atty. Reg. No. 0069829, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
     Attorney for Plaintiff-Appellee

CANDI S. RAMBO, Atty. Reg. No. 0076627, 15 West Fourth Street, Suite 100, Dayton, Ohio 45402
     Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, J.

{¶ 1} Timothy Lam appeals from a judgment of the Montgomery County Court of Common Pleas, which found him guilty of possession of heroin on his no contest

plea after overruling his motion to suppress evidence.   He was sentenced to twelve months of imprisonment.

{¶ 2}   For the following reasons, the judgment of the trial court will be affirmed.

{¶ 3}   The events which led to Lam's arrest began when Dayton police officers approached his brother, Jeffrey Lam ("Jeffrey"), regarding a traffic violation. On the evening of December 12, 2011, Officers Michael Saylors and Randy Beane observed Jeffrey driving a gold Intrigue near the intersection of Hodapp and Lorain Avenues.  The officers were familiar with Jeffrey from "a lot of history," and they knew that Jeffrey and his brother, Timothy, had possessed firearms and drugs during past contacts with the police. Additionally, Beane knew that Jeffrey had fled from police two weeks earlier in the same car, because Beane had participated in the search for the vehicle.  The officers knew from prior interactions that Jeffrey's driver's license had been suspended several times, and Beane knew from running Jeffrey's license two weeks earlier that Jeffrey had been under suspension at that time.

{¶ 4}   Based on Jeffrey's history of fleeing from the police, the officers' desire to avoid a chase, and the officers' knowledge that they were in the vicinity of Jeffrey's home, which was located at 645 Creighton Avenue, the officers decided to follow Jeffrey rather than immediately initiate a stop for driving without a license and any other pending charges related to his flight from police two weeks earlier.  (The officers did not know, at that time, whether there were any outstanding warrants for Jeffrey.) While following him, they observed a turn signal violation.  When Jeffrey parked behind 645 Creighton, the officers

activated their emergency lights.

{¶ 5} As soon as the lights were activated, both doors of the Intrigue "flew open," and Jeffrey and another individual (James Farr) fled on foot. The officers pursued Jeffrey and Farr. Saylors tackled and detained Farr. After a brief chase through the neighborhood, Beane saw Timothy Lam (Jeffrey's brother) on the porch of 645 Creighton and saw Jeffrey run from between the neighboring houses into 645 Creighton. Both men went into the house and closed the door behind them. The officers attempted, unsuccessfully, to kick in the door. Although the officers could see individuals inside the house, no one responded to their commands to open the door. The officers retrieved a battering ram from their cruiser and, using it, entered the house. Additional backup had arrived by this time.

{¶ 6} Upon entering the house, Beane ordered Jeffrey and another man to the floor at gunpoint. Beane heard an upstairs toilet flushing, and another officer on the perimeter of the house radioed that he heard a person or persons moving around on the second floor of the house. Officers conducted a sweep of the house for their safety. They encountered Timothy Lam coming down the steps from the second floor, and two other men were found upstairs, including one who was hiding.

{¶ 7} During their sweep of the house, officers observed crack cocaine in a bedroom, marijuana under a bed and on a stairwell, and heroin in the kitchen, all in plain view. While detaining the men found in the house, the officers called for a drug unit and obtained a search warrant for the house.[1] One of the rooms had a note with Timothy Lam's

---

[1] Officer Beane testified that the Lams' mother, Cheryl Fitswater, who "rents the house," gave them permission to search the house, but the State did not rely on this alleged consent at the suppression hearing.

name on it taped to the door, and inside the room a pill bottle and checkbook listed Timothy Lam's name. In searching this bedroom pursuant to the warrant, Detective Jason Barnes found crack cocaine in a nightstand drawer. Timothy Lam was placed under arrest for possession and obstruction of justice (for not opening the door on the officers' orders), and he was searched. The search revealed a bag of heroin tied to the drawstring of the shorts Lam was wearing under his jeans.

{¶ 8} Lam entered a not guilty plea and filed a motion to suppress, in which he argued that the police lacked any legal basis to enter his home without a warrant and to search his home and his person.

{¶ 9} After a hearing, the court agreed, in principle, with Lam's argument that a warrantless entry into a house "may not be made for [a] minor misdemeanor." Further, the court cautioned that "courts should carefully assess circumstances when obstructing official business is sought to be used for warrantless entry into a premises." The court observed that, in some circumstances, such as an obstruction charge rooted in the failure to open a door to officers attempting to serve a minor misdemeanor citation, it might find that police entry into a home was unlawful. Under the facts of this case, however, the court concluded that a "wholly separate criminal act" from the turn signal violation occurred when Jeffrey "challenged the officer's authority to lawfully cite a citizen found outside the sanctity of his home" by fleeing, and that this separate act justified the pursuit into the home. The trial court's decision did not refer to the officers' alleged belief that Jeffrey had been driving without a valid license. The trial court overruled the motion to suppress.

{¶ 10} Lam subsequently entered a no contest plea to possession of heroin in an

amount greater than one gram but less than five grams, a felony of the fourth degree. He was found guilty and sentenced to twelve months of imprisonment.

{¶ 11}   Lam raises one assignment of error on appeal.

**The Trial Court Erred in Overruling Appellant's Motion to Suppress.**

{¶ 12}   Lam contends that the evidence against him should have been suppressed because no exigent circumstances justified the police officers' entry into his home and because the officers lacked probable cause to arrest him.

{¶ 13}   The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution protect individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *State v. Pressly*, 2d Dist. Montgomery No. 24852, 2012-Ohio-4083, ¶ 18.  "Under applicable legal standards, the State has the burden of showing the validity of a warrantless search, because warrantless searches are 'per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well delineated exceptions.'" *State v. Hilton*, 2d Dist. Champaign No. 08-CA-18, 2009-Ohio-5744, ¶ 21-22, citing *Xenia v. Wallace*, 37 Ohio St.3d 216, 218, 524 N.E.2d 889 (1988).  Exigent circumstances are a well-established exception to the Fourth Amendment's warrant requirement. *State v. Andrews*, 177 Ohio App.3d 593, 2008-Ohio-3993, 895 N.E.2d 585,¶ 23 (11th Dist.); *State v. Berry*, 167 Ohio App.3d 206, 2006-Ohio-3035, 854 N.E.2d 558,¶ 12 (2d Dist.).

{¶ 14}   "The United States Supreme Court has held that an exigent circumstance is (1) an emergency situation which arises when a person in the home is in need of 'immediate aid' or there is a life-threatening situation, or (2) a 'hot pursuit.' *Mincey v. Arizona*, 437

U.S. 385, 392-393, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *State v. Bowe*, 52 Ohio App.3d 112, 113, 557 N.E.2d 139 (9th Dist.1988)." *State v. Bell*, 2d Dist. Greene No. 2012 CA 15, 2012-Ohio-4853. *See also State v. Akron Airport Post No. 8975*, 19 Ohio St.3d 49, 51, 482 N.E.2d 606 (1985) (holding that hot pursuit and probable cause to search accompanied by the presence of exigent circumstances have each been recognized as exceptions to the search warrant requirement). In Lam's case, the State did not assert that there had been a life-threatening situation, a potential for the destruction of evidence, or any other "emergency situation" constituting an exigent circumstance; it argued that the officers had been justified in entering the house because they did so in hot pursuit of Jeffrey.

{¶ 15} Lam's argument emphasizes that Jeffrey's turn signal violation was a minor misdemeanor, "the most minor offense possible" and subject only to a fine. Relying on *Welsh v. Wisconsin*, 466 U.S. 740, 754, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) and other cases, he asserts that "the exigent circumstance premised upon flight from a minor-misdemeanor offense is insufficient to overcome the presumption of unreasonableness" that attaches to a warrantless entry. Welsh's home was entered without a warrant and he was arrested for DWI but, at the time, this was a "non-criminal civil forfeiture offense." The entry was based on the argument that Welsh's blood-alcohol level might have dissipated had the officers waited for a warrant. There was no "hot pursuit" argument in that case.

{¶ 16} Lam also relies on *Dorman v. United States*, 435 F.2d 385 (C.A.D.C.1970) and *State v. Bowe*, 52 Ohio App.3d 112, 557 N.E.2d 139 (9th Dist.1988), which set forth factors to be considered in determining whether there was "an immediate major crisis

mandating a warrantless entry of a home." *Bowe* at 114. But these cases addressed emergency situations, not hot pursuit. In neither *Dorman* nor *Bowe* did officers chase suspects into the homes they entered; in these cases, both of which involved robberies, the locations that were searched were identified through a probation report that was left at the scene by one of the suspects (*Dorman*) and through tracing the license plate of a vehicle observed at the scene (*Bowe*).

{¶ 17} In *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), the Supreme Court held that a suspect "may not defeat an arrest which has been set in motion in a public place * * * by the expedient of escaping to a private place," including a home, notwithstanding the general prohibition against warrantless entry into a residence. *Id.* at 43. The suspect in *Santana* was believed to have committed a felony, and the police pursued her from a public place (her porch), at which they first confronted her, into her home. The U.S. Supreme Court held that the police, who had probable cause to arrest the defendant, could not be thwarted in that effort by the defendant's retreat into her house.

{¶ 18} In *Middletown v. Flinchum*, 95 Ohio St.3d 43, 2002-Ohio-1625, 765 N.E.2d 330, the Supreme Court of Ohio, relying on *Santana*, extended the hot pursuit exception to the search warrant requirement to misdemeanor offenses, stating, "we see no reason to differentiate appellant's offense and give him a free pass merely because he was not charged with a more serious crime. The basic fact remains that appellant fled from police who were in hot pursuit of him and who had identified themselves as police officers." *Id*. at 45.[2]

---

[2]The court did not rely on the flight itself as an additional basis or offense justifying the pursuit.

{¶ 19}    As in Jeffrey Lam's case, the offense for which the police sought to arrest the defendant in *Flinchum* was a minor misdemeanor (reckless operation).  "The crux of [Flinchum's] claim [was] that police could not enter his home to arrest him without a warrant where he had committed only a traffic infraction, which is a minor misdemeanor." *Middletown v. Flinchum*, 12th Dist. Butler No. CA99-11-193, 2000 WL 1843199, *2 (Dec. 18, 2000).  Although *Flinchum* was ultimately charged with driving under the influence as well as reckless driving, the appellate court's opinion expressly stated that the arresting officer "was not aware of facts that would have shown appellant was intoxicated until the officer observed appellant inside his home during his arrest."  *Id*. at *4, fn.5.  Thus, although the supreme court in *Flinchum* refers to fleeing into a house *to avoid arrest*, the basis for the pursuit in *Flinchum* was a traffic infraction (as was the case with the pursuit of Jeffrey Lam), which is typically not an arrestable offense.[3]  On the authority of *Flinchum*, we must conclude that the police were lawfully inside the Lams' house when they observed the drugs which formed the basis for the search warrant.

{¶ 20}    The supreme court's opinion in *Flinchum* contains a strongly-worded dissent in which Justice Pfeifer distinguishes *Santana* from *Flinchum,* based on the seriousness of the offense and the "realistic expectation" in *Santana* that delay in executing a search would result in the destruction of evidence (heroin and marked money), a concern which was not present in *Flinchum*.  It also emphasizes that "the circumstances of a particular situation must be grave * * * to merit a lifting of [Fourth Amendment]

---

[3]We note that the appellate court in *Flinchum* made a distinction among misdemeanor offenses, for purposes of warrantless entry, based on whether the offense was "minor" or "serious," which was determined by whether it was "a jailable offense."    The supreme court, however, did not mention these distinctions in affirming the appellate court.

protections." *Flinchum*, 95 Ohio St.3d at 47 (Pfeifer, J., dissenting), citing *Welsh*, 466 U.S. 740, 748, 104 S.Ct. 2091, 80 L.Ed.2d 732 (involving exigent circumstances). Justice Pfeifer observed that, when warrantless arrests in the home are at issue, hesitation in finding a basis for acting without a warrant "is particularly appropriate when the underlying offense for which there is probable cause to arrest is relatively minor. * * * When the government's interest is only to arrest for a minor offense, th[e] presumption of unreasonableness is difficult to rebut, and the government usually should be allowed to make such arrests only with a warrant issued upon probable cause by a neutral and detached magistrate." *Id.*, citing *Welsh* at 750. The dissent concluded that the government had not successfully rebutted the presumption of unreasonableness in *Flinchum,* because only a minor traffic offense was at issue, and that the arrest of "a mere tire spinner" did not justify the chipping away of a well-established Fourth Amendment right.

{¶ 21} We share the concerns expressed in the *Flinchum* dissent. Although we are bound by supreme court precedent, we have reservations about permitting police officers to chase a suspect who is known to have committed only a minor traffic violation and to forcibly enter into his house, in the absence of exigent circumstances. This is a circumstance where a potential traffic violation developed into a chase of the driver, which led to the forcible entry of that person's home, which turned into a protective sweep of the home, which resulted in the plain view of contraband, which generated a search warrant, which resulted in the arrest of a second person, which resulted in the discovery of drugs. This may be the unusual situation where legal reasoning has plunged off the slippery slope or where the exceptions have swallowed the rule.

{¶ 22}    We see no reason why, in Jeffrey Lam's case, the officers could not have waited outside the house while they obtained a search warrant or checked for outstanding warrants for Jeffrey.   In *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), the U.S. Supreme Court held that the Fourth Amendment prohibits police from making a warrantless and nonconsensual entry into a suspect's house in order to make a routine felony arrest.   As discussed above, *Payton* and other decisions have recognized an exception for "exigent circumstances."   *Id.* at 1386.   Similarly, R.C. 2935.12 only permits entry by force to make a warrantless arrest if exigent circumstances exist.   *State v. Boyd*, 2d Dist. Montgomery No. 13425, 1993 WL 169104 (May 21, 1993).

{¶ 23}    However, the principle from which any exceptions to the warrant requirement emanate is reflected in the oft-quoted remarks of William Pitt in 1763:   "The poorest man may in his cottage bid defiance to all the forces of the Crown.   It may be frail; its roof may shake; the wind may blow through it, the storm may enter; the rain may enter; but the King of England cannot enter – all his force dares not cross the threshold of the ruined tenement!"   *Payton* at 1388, fn. 54, citing *Miller v. United States*, 357 U.S. 301, 307, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958).   Indeed, President John Adams traced the origins of our independence from England to James Otis's 1791 argument against British writs of assistance, where he declared that a "man's house is his castle."   *United States v. Verdugo-Urquidez*, 494 U.S. 259, 110 S.Ct. 1056, 1072, 108 L.Ed.2d 222, fn. 8 (1990) (Brennan, J., dissenting).   It may be that Jeffrey would have temporarily "defeated" his citation for the traffic offense by "escaping to a private place," but weighing the immediate serving of a citation for a non-jailable minor misdemeanor against the Fourth Amendment's

protection of the home, we would make what should be the obvious choice.

{¶ 24}    However, the facts surrounding the chase of Jeffrey Lam are not legally distinguishable from the facts in   *Flinchum*.    Thus, we are obligated to follow our understanding of the majority's opinion in *Flinchum*, as the trial court did, and to conclude that the police officers lawfully entered into the house.  We hope that the Ohio Supreme Court will reconsider or clarify its position.

{¶ 25}    Once inside the house, the officers heard a toilet flushing upstairs, and an officer on the perimeter of the house reported hearing movement upstairs.   The officers on the scene were aware that the Lams had been known to possess drugs and firearms in the past and had tried to run over a police officer with a vehicle.   In this situation, they had legitimate concerns for their safety, and they were justified in conducting a protective sweep of the house.  See *Maryland v. Buie*, 494 U.S. 325, 333, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (finding a legitimate "interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested, is not harboring other persons who are dangerous and who could unexpectedly launch an attack.").[4]

{¶ 26}    During the protective sweep, officers observed heroin in the kitchen in a trash can with no lid, crack cocaine in one of the bedrooms, marijuana under a bed (while looking for anyone who might be hiding), and marijuana on the stairs.  The plain view exception to the warrant requirement applies in situations where (1) the original intrusion by which the police viewed the item was lawful; (2) the discovery of the evidence was

---

[4]Upon observing drugs in the house and hearing a toilet flush upstairs, exigent circumstances — the fear of the destruction of evidence — may also have justified the search.

inadvertent; and (3) the incriminating nature of the evidence was immediately apparent. *State v. Williams*, 55 Ohio St.2d 82, 85, 377 N.E.2d 1013 (1978), citing *Coolidge v. New Hampshire*, 403 U.S. 443, 446, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The plain view doctrine applied under the facts of this case, and the officers properly relied on the drugs observed in plain view to obtain a search warrant for the house.

{¶ 27} Lam also argues that the crack cocaine was found in his nightstand drawer during the officers' protective sweep and that they used this evidence "to justify his arrest and subsequent search of his person," which led to the discovery of the heroin tied to the drawstring of his pants. He claims that, because a person could not fit in his drawer, the officers should not have been looking there during the protective sweep, and his arrest was improper.

{¶ 28} Lam's argument is refuted by the evidence offered at the suppression hearing. Detective Jason Barnes testified that the crack cocaine in Lam's nightstand was found when Barnes conducted his search pursuant to the search warrant. No evidence was presented that the nightstand was searched during the protective sweep. Thus, Lam's arrest pursuant to the discovery of drugs in his room, and the search that followed, were not improper.

{¶ 29} The trial court did not err in overruling Lam's motion to suppress.

{¶ 30} The assignment of error is overruled.

{¶ 31} The judgment of the trial court will be affirmed.

. . . . . . . . . .

DONOVAN, J., concurs in judgment only.

13

FAIN, J., concurring in the judgment:

{¶ 32}   I write separately because I do not share in the criticism of the result in *Middletown v. Flinchum*, 93 Ohio St.3d 43, 2002-Ohio-1625, 765 N.E.2d 330.   The defendant in that case, like Jeffrey Lam in this case, was complicit in the escalation of the events that began with the police having initiated a traffic stop.   Both men could have stopped and waited for the police to issue a citation.   Instead, they fled.   In my view, it was not unreasonable, in either case, for the police to pursue the fleeing suspect, even when that resulted in a warrantless entry into a residence.

{¶ 33}   In all other respects, I concur in Judge Froelich's opinion for this Court.

. . . . . . . . . .

Copies mailed to:

Michele D. Phipps
Candi S. Rambo
Hon. Gregory F. Singer