[Cite as *State v. Lam*, 2015-Ohio-4293.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 26428 |
| | : | |
| v. | : | T.C. NO. 11CR4263/2 |
| | : | |
| JEFFREY LAM | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the ___16th___ day of _____October_____, 2015.

. . . . . . . . . . .

KIRSTEN A. BRANDT, Atty. Reg. No. 0070162, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

JAMES S. ARMSTRONG, Atty. Reg. No. 0020638, 131 N. Ludlow Street, Suite 386 Talbott Tower, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, P.J.

{¶ 1} Jeffrey Lam was convicted after a jury trial in the Montgomery County Court of Common Pleas of obstructing official business, possession of marijuana (200g or more, but less than 1,000g), and possession of cocaine (more than 100g), with a major drug offender specification. The trial court merged obstructing official business with the other

two charges and imposed concurrent sentences totaling eleven years in prison.

{¶ 2} Lam appeals from his conviction, raising five assignments of error. For the following reasons, the trial court's judgment will be affirmed.

## I. Motion to Suppress

{¶ 3} In his fifth assignment of error, Lam claims that the trial court erred in overruling his motion to suppress.

{¶ 4} In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994); *State v. Knisley*, 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30. Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Retherford* at 592. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

{¶ 5} Lam moved to suppress evidence obtained from a search of his residence and any statements he made to the police. After a hearing, the trial court overruled the motion. Lam claims that the trial court erred in overruling his motion to suppress, because the police officers' entry into the residence was unlawful and the officers' finding of marijuana under an air mattress exceeded the scope of a protective search. Lam further asserts that the subsequent search of the residence pursuant to a search warrant was "improperly tainted" by evidence garnered during the allegedly unlawful entry and protective sweep.

{¶ 6} The first issue raised by Lam, i.e., that the officers unlawfully entered Lam's residence, was addressed in an appeal by Lam's co-defendant, his brother Timothy Lam. Lam acknowledges that the "facts and law are identical." The parties presented, as a joint exhibit, the suppression hearing transcript in Timothy's case, and that transcript constituted the bulk of the evidence for purposes of Lam's motion to suppress. Lam presented one additional witness, his girlfriend, Nicole Herron, who testified about the air mattress in the bedroom where a large amount of marijuana was found.

{¶ 7} According to the suppression hearing testimony in Timothy's case, on the evening of December 12, 2011, Officers Michael Saylors and Randy Beane observed Lam driving a gold Intrigue near the intersection of Hodapp and Lorain Avenues. The officers were familiar with Lam from "a lot of history," and they knew that Lam and his brother, Timothy, had possessed firearms and drugs during past contacts with the police. Additionally, Officer Beane knew that Jeffrey had fled from police two weeks earlier in the same car, because Beane had participated in the search for the vehicle. The officers knew from prior interactions that Lam's driver's license had been suspended several times, and Officer Beane knew from running Jeffrey's license two weeks earlier that Jeffrey had been under suspension at that time.

{¶ 8} Based on Lam's history of fleeing from the police, the officers' desire to avoid a chase, and the officers' knowledge that they were in the vicinity of Lam's home, which was located at 645 Creighton Avenue, the officers decided to follow Lam rather than immediately initiate a stop for driving without a license and any other pending charges related to his flight from police two weeks earlier. (The officers did not know, at that time, whether there were any outstanding warrants for Lam.) While following him,

they observed a turn signal violation. When Lam parked behind 645 Creighton, the officers activated their emergency lights.

{¶ 9} As soon as the lights were activated, both doors of the Intrigue "flew open," and Lam and another individual, James Farr, fled on foot. The officers pursued Lam and Farr; Officer Saylors tackled and detained Farr. After a brief chase through the neighborhood, Officer Beane saw Timothy Lam on the porch of 645 Creighton and saw Jeffrey Lam run from between the neighboring houses into the residence. Both men went into the house and closed the door behind them. The officers attempted, unsuccessfully, to kick in the door. Although the officers could see individuals inside the house, no one responded to their commands to open the door. The officers retrieved a battering ram from their cruiser and, using it, entered the house. Additional backup had arrived by this time.

{¶ 10} Upon entering the house, Officer Beane ordered Jeffrey Lam and another man, Vincent Johnson, to the floor at gunpoint. Beane heard an upstairs toilet flushing, and another officer on the perimeter of the house radioed that he heard a person or persons moving around on the second floor of the residence. Officers conducted a sweep of the house for their safety. They encountered Timothy coming down the steps from the second floor, and two other men were found upstairs, including one who was hiding.

{¶ 11} During their sweep of the house, officers observed crack cocaine in a bedroom, marijuana on a shelf in the stairwell, and heroin in the kitchen, all in plain view. The officers also looked under an air mattress in Lam's bedroom and saw 32 plastic bags

of marijuana.[1]   While detaining the men found in the house, the officers called for a drug unit and obtained a search warrant for the house.[2]   During the search of the home pursuant to the warrant, the officers discovered large amounts of cocaine in the closet of the bedroom where the bags of marijuana were found.

**{¶ 12}** The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution protect individuals from unreasonable searches and seizures.   *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *State v. Pressley*, 2d Dist. Montgomery No. 24852, 2012-Ohio-4083, ¶ 18.   "Under applicable legal standards, the State has the burden of showing the validity of a warrantless search, because warrantless searches are 'per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well delineated exceptions.' "   *State v. Hilton*, 2d Dist. Champaign No. 08-CA-18, 2009-Ohio-5744, ¶ 21-22, citing *Xenia v. Wallace*, 37 Ohio St.3d 216, 218, 524 N.E.2d 889 (1988).   Exigent circumstances are a well-established exception to the Fourth Amendment's warrant requirement.   *State v. Andrews*, 177 Ohio App.3d 593, 2008-Ohio-3993, 895 N.E.2d 585, ¶ 23 (11th Dist.); *State v. Berry*, 167 Ohio App.3d 206, 2006-Ohio-3035, 854 N.E.2d 558,¶ 12 (2d Dist.).

**{¶ 13}** "The United States Supreme Court has held that an exigent circumstance

---

[1]   Timothy Lam did not challenge the officers' looking under the air mattress, and we stated in his appeal that this marijuana was also in plain view.   *State v. Lam*, 2013-Ohio-505, 989 N.E.2d 100, ¶ 7 (2d Dist.).   However, there was no testimony at Timothy's suppression hearing about the bed's being an air mattress or the position of the air mattress in the room.   We do not find our statement in Timothy's appeal that the marijuana was found in plain view to be dispositive in this appeal.

[2]   Officer Beane testified that the Lams' mother, Cheryl Fitzwater, who "rents the house," gave them permission to search the house, but the State did not rely on this alleged consent at the suppression hearing.

is (1) an emergency situation which arises when a person in the home is in need of 'immediate aid' or there is a life-threatening situation, or (2) a 'hot pursuit.' *Mincey v. Arizona*, 437 U.S. 385, 392-393, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *State v. Bowe*, 52 Ohio App.3d 112, 113, 557 N.E.2d 139 (9th Dist.1988)." *State v. Bell*, 2d Dist. Greene No. 2012 CA 15, 2012-Ohio-4853, ¶ 12.

**{¶ 14}** Lam asserts that the officers' initial entry into 645 Creighton was unlawful. However, he recognizes that we rejected this argument in his brother's appeal stemming from the same facts. Specifically, in Timothy's case, we rejected the argument that a turn signal violation, a minor misdemeanor, did not justify the officers' chasing Timothy into his residence. *State v. Lam*, 2013-Ohio-505, 989 N.E.2d 100 (2d Dist.). We relied on *Middletown v. Flinchum*, 95 Ohio St.3d 43, 2002-Ohio-1625, 765 N.E.2d 330, in which the Supreme Court of Ohio, relying on *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), extended the hot pursuit exception to the search warrant requirement to misdemeanor offenses, stating, "we see no reason to differentiate appellant's offense and give him a free pass merely because he was not charged with a more serious crime. The basic fact remains that appellant fled from police who were in hot pursuit of him and who had identified themselves as police officers." *Flinchum* at 45. Although we were reluctant to reach this holding in Timothy's case, we find no basis to alter our reasoning in Lam's case.

**{¶ 15}** Next, Lam claims that the police officers' search under the air mattress exceeded the scope of a protective sweep.

**{¶ 16}** "A protective sweep is a reasonable exception to the Fourth Amendment's warrant requirement." *State v. Mathews*, 2d Dist. Montgomery No. 26326, 2015-Ohio-

1047, ¶ 10, citing *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). A protective sweep, however, is not a full search of the premises. *Id.* It is only a "cursory inspection of those areas where a person who possesses a threat of danger to the police may be found." *State v. Young*, 2d Dist. Montgomery No. 24537, 2011-Ohio-4875, ¶ 17; *see also State v. Koon*, 2d Dist. Montgomery No. 26296, 2015-Ohio-1326, ¶ 14.

{¶ 17} A protective sweep is permitted when "'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the * * * scene.'" *State v. Sharpe*, 174 Ohio App.3d 498, 2008-Ohio-267, 882 N.E.2d 960, ¶ 36 (2d Dist.), quoting *Buie*, 494 U.S. at 334. If contraband is found during a protective sweep, the plain view doctrine would allow the officer to seize it, without a warrant. *Mathews* at ¶ 14.

{¶ 18} Lam does not dispute that the police, in general, were justified in conducting a protective sweep of the home, and the record supports the conclusion that reasonably prudent officers would have believed that the home contained individuals who posed a danger to them. An officer outside the home had observed an individual or persons moving around on the second floor, officers heard movement and a toilet flush upstairs, and Timothy was located coming down the steps from the second floor; two other men (one of whom was hiding) were found upstairs in different bedrooms. The officers were familiar with the Lams and knew from past interactions that the Lams previously possessed both drugs and firearms.

{¶ 19} The issue, therefore, is whether the officers' looking under the air mattress

exceeded the lawful protective sweep. Officer Beane testified that a protective sweep involves going into different rooms and making sure nobody is there. With respect to the bedroom where the marijuana was found, Beane testified that when he went into that room, he saw what he believed was crack cocaine in plain sight, and "then we made sure no one was hiding underneath the bed. The bed was flipped out, there was a large amount of marijuana, to make sure no one was hiding underneath the bed." (Supp.Tr. at 44-45.)

{¶ 20} Lam's girlfriend, Herron, testified at Lam's suppression hearing that she had been at Lam's residence on approximately December 10, a day or two before he was arrested. She stated that she had stayed in Lam's bedroom, which contained an air mattress, a dresser, a television, a closet, and a window. The air mattress was in a corner and on the floor, not on top of a box spring. Herron described the air mattress as a "double queen" that "looked like two mattresses but you could tell it's a[n] air bed because it's rounded." Herron stated that the air mattress had a sheet and a comforter, which did not go down to the floor; part of the air mattress remained visible. When Herron was at the residence, the air mattress sat "flat on the floor." Herron stated that she did not feel anything under the air mattress when she was on it. The bed was not made when Herron left the residence on December 11.

{¶ 21} On cross-examination, Herron stated that she had seen Ziploc bags of marijuana before. The prosecutor asked Herron if she thought she would have felt 32 plastic bags of marijuana under the bed; Herron responded, "Yes." Herron further stated that, if there were 32 bags of marijuana underneath the air mattress, she would not think the air mattress would sit flat against the floor. However, on redirect examination, Herron

stated that she would not expect 32 bags of marijuana to be as thick as a human body under the bed.   Herron further testified on cross-examination that there could have been a gap between the mattress and the wall and that either bedding or pillows could have covered that gap.   Finally, Herron was asked if a handgun would be visible under the air mattress based on how the mattress appeared.   Herron responded, "No, you wouldn't be able to see it."

{¶ 22} The trial court overruled Lam's argument concerning the officers' search under the air mattress in the bedroom.   The court found that "under the context and the totality of circumstances in that case and in the context of a protective sweep that the search for other persons including children or firearms that that brief check under the mattress was appropriate for officer safety and the safety of others."

{¶ 23} At the outset, we disagree with the trial court's suggestion that a cursory search under the mattress was justified to search for firearms.   The "protective sweep" exception to the warrant requirement authorizes a limited search of places where a *person* may be found, not firearms or other weapons.   *See, e.g., Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276.

{¶ 24} The evidence is sparse regarding whether a reasonably prudent officer would have believed that the area under the air mattress could harbor an individual that posed a danger to the officer.   There was no testimony describing how the air mattress was situated on December 12, when the protective sweep occurred, and Officer Beane offered no testimony that he had previously found individuals hiding under air mattresses on the floor.   Based on Herron's testimony, the trial court could have reasonably concluded that the air mattress did not lay flat on the floor, given the numerous bags of

marijuana beneath it, but there is no indication how high off the floor some or all of the air mattress was elevated. Herron indicated that it was not high enough to suggest a person was located underneath.

**{¶ 25}** Construing the evidence in the light most favorably to the State, we conclude that the trial court erred in finding that the brief search under the air mattress was authorized by a protective sweep of the residence. Simply stated, the State did not present sufficient evidence of the placement and appearance of the air mattress from which we can conclude that the officers could have reasonably believed that someone might be hiding underneath. Nor did the State present any evidence that, based on their past experience, a protective sweep under the air mattress was reasonable. The air mattress was not the focus of Timothy's motion to suppress, and the State presented no evidence at Lam's suppression hearing to support its contention that a person could have been hiding underneath it.

**{¶ 26}** To be clear, we are not saying, as a matter of law, that a person could not have been hiding under the air mattress. Rather, we conclude that the State failed to meet its burden of establishing that, based on the location and appearance of the air mattress at the time of the protective sweep, the officers reasonably believed that a person could have been hidden there, justifying a cursory look during the protective sweep.

**{¶ 27}** Next, Lam asserts that all of the evidence seized pursuant to the subsequently-obtained search warrant was "improperly tainted by evidence garnered during the unlawful entry * * * and sweep of the Creighton home." He argues that, if the officers' entry into the residence were unlawful, all of the drugs must be suppressed,

including the cocaine that was located in a closet after a search warrant was obtained. Alternatively, Lam states that, "even if the entry was proper, the marijuana was found in an improper expansion of a sweep and should have been suppressed."

{¶ 28} As discussed above, the officers' entry into the home was not unlawful; the officers properly entered the home under the hot pursuit doctrine. And, the officers were justified in conducting a protective sweep of the residence. Although the officers should not have looked under the air mattress given the evidence before us, the officers properly observed heroin, marijuana on a shelf along the stairway, and crack cocaine, all in plain sight, during the protective sweep.

{¶ 29} The search warrant affidavit was not offered into evidence at either Timothy's or Jeffrey's suppression hearing,[3] and Lam presented no evidence that the search warrant was based solely on the improperly-found marijuana under the air mattress. Lam's brief appears to acknowledge that, if the entry in to the home was lawful, the police properly obtained a search warrant based on the drugs properly found in plain view. Because the marijuana would have been found during the search pursuant to the search warrant, we cannot conclude that seizure of the drugs within the house – including the marijuana under the air mattress - was tainted by the officers' cursory look under the air mattress.

{¶ 30} This case is distinguishable from *State v. Sharpe*, 174 Ohio App.3d 498,

---

[3] The prosecutor stated during Jeffrey Lam's jury trial that the search warrant was marked at a prior suppression hearing as Exhibit 1 and that the prosecutor was renumbering the document as Exhibit 10 for trial. However, the existence of the search warrant was not disputed at Timothy Lam's suppression hearing, and there is no indication it was offered into evidence then. Prior to the jury's deliberations, the affidavit was removed from the search warrant and marked as Exhibit 10A; it was not provided to the jury, but remains part of the record.

2008-Ohio-267, 882 N.E.2d 960, in which we held that evidence of drugs found during a protective sweep of the defendant's home after the defendant's arrest was not admissible under the inevitable discovery doctrine. We concluded in *Sharpe* that officers did not conduct a lawful protective sweep of the defendant's house following the defendant's arrest, as the officers lacked a reasonable and articulable suspicion that other persons who might pose a danger to the officers remained inside the defendant's house. We further found that the drugs would not have been inevitably found during a subsequent search pursuant to a warrant, because the warrant was based on probable cause obtained from the improper warrantless search.

{¶ 31} Unlike in *Sharpe*, the officers here were entitled to conduct a protective sweep of 645 Creighton, and the subsequent search warrant was based on probable cause, even without the information obtained from the improper portion of the protective sweep.

{¶ 32} In this respect, this case is similar to *State v. Koon*, 2d Dist. Montgomery No. 26296, 2015-Ohio-1326. In *Koon*, the defendant claimed that the officers improperly conducted a protective sweep of a home with a suspected "grow operation" while awaiting a search warrant. Although no evidence was removed from the house during the protective sweep, evidence observed inside during the sweep was mentioned in the search warrant affidavit. The police obtained a warrant and executed it the same day.

{¶ 33} On appeal, the defendant contended, citing *Sharpe*, that the protective sweep was impermissible and that suppression could not be avoided based on the inevitable discovery rule or by excising from the warrant affidavit all statements about the evidence seen inside the house. In overruling defendant's objections, we stated that we

did not need to decide the protective sweep issue because, even assuming the sweep was unjustified, the subsequent search of the home was pursuant to a warrant and the affidavit contained sufficient untainted evidence to establish probable cause for the warrant. We stated, "Here the officers' observations during the protective sweep were not critical to the existence of probable cause," and we noted that "[t]he most significant distinction between Koon's case and *Sharpe* is that Detective McGuire's affidavit established probable cause even without consideration of evidence seen during the protective sweep." *Koon* at ¶ 21.

**{¶ 34}** Here, the search warrant affidavit depended on evidence observed during the protective sweep, but the protective sweep was not unlawful in its entirety. Only the officers' cursory search under the air mattress was impermissible. Excising the observation of the marijuana under the air mattress, the officers' lawful observations of heroin and crack cocaine in plain view established probable cause for the warrant. Accordingly, the trial court did not err in denying Lam's motion to suppress the drugs seized pursuant to the search warrant.

**{¶ 35}** Lam's fifth assignment of error is overruled.

## II. Sufficiency and Manifest Weight of the Evidence

**{¶ 36}** Lam's first assignment of error claims that the State presented insufficient evidence – both in its case-in-chief and at the close of all the evidence - that he possessed the marijuana found under the air mattress or the cocaine found in the closet, both of which were located in the southwest bedroom of the house (immediately to the right at the top of the stairs). Lam states that, because there was no evidence of actual possession, the State was required to prove constructive possession, which it did not.

Lam's second assignment of error claims that his "drug verdicts" were against the manifest weight of the evidence.

{¶ 37} When reviewing the denial of a Crim.R. 29(A) motion, an appellate court applies the same standard as is used to review a sufficiency of the evidence claim. *State v. Sheppeard*, 2d Dist. Clark No. 2012 CA 27, 2013-Ohio-812, ¶ 51. "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 38} In contrast, "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *Wilson* at ¶ 12. *See Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 ("'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion"). When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 39} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of

particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. *Id.* The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 40} R.C. 2925.11(A) prohibits a person from knowingly possessing drugs. "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶ 41} "'Possess' or 'possession' means having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K). "Possession of a drug may be either actual physical possession or constructive possession. A person has constructive possession of an item when he is conscious of the presence of the object and able to exercise dominion and control over that item, even if it is not within his immediate physical possession." (Citations omitted.) *State v. Mabry*, 2d Dist. Montgomery No. 21569, 2007-Ohio-1895, ¶ 18. In determining whether an individual possessed drugs, it is necessary to consider all of the facts and circumstances surrounding the incident. *Id.* at ¶ 20.

{¶ 42} According to the State's evidence at trial, 645 Creighton Avenue is a two-

story home with a basement. The second floor has three bedrooms and a bathroom. On December 12, 2011, Lam drove his vehicle to the Creighton address and parked his car in the alley behind the house. Lam was ultimately arrested inside the house.

{¶ 43} Officer Saylors, one of the officers involved in the traffic stop, testified that he knew Timothy and Jeffrey Lam lived at the Creighton residence with their mother and that they had resided there for a "couple months" and "less than a year." On December 12, 2011, Lam's mother, Cheryl Fitzwater, indicated to Detective Ryan Halburnt that she lived at the house with her two sons.

{¶ 44} It was apparent from the objects within two of the bedrooms that those bedrooms were used by Timothy Lam and Cheryl Fitzwater. Detective Jason Barnes testified that the northwest bedroom contained several items that belonged to Timothy. The officers referred to the third bedroom, the southwest bedroom, as Jeffrey Lam's bedroom.

{¶ 45} The southwest bedroom had an air mattress, a dresser, and a closet. Officer Setty testified that the room appeared to be "lived in." There were personal items and knickknacks on top of the dresser, and "stuff" on top of the mattress and on the floor. Both the dresser and the closet contained clothing. There was no testimony as to what the "stuff" or "knickknacks" was or the nature of the clothing (e.g., male or female, or size) observed. A baggie of crack cocaine was found on top of the dresser. Officer Setty did not see anything to identify the owner of the items in the southwest bedroom, he did not know firsthand who lived in the room, and he did not collect any of the personal items as evidence. There was no lock on the door to the bedroom or to the closet.

{¶ 46} Detective Halburnt searched the southwest bedroom after a search

warrant was obtained. Starting with the dresser, the detective found a letter, dated September 19, 2011, addressed to Jeffrey Lam at 645 Creighton Avenue. The detective did not see or collect an envelope. A second baggie of crack cocaine was found inside the dresser. Upon searching the closet, the detective located a backpack containing a pair of rolled-up jeans. Inside the jeans was a Crown Royal bag with a large amount of crack cocaine in it. Detective Halburnt testified that there were several pairs of jeans on the floor; he checked the pockets, but did not find anything belonging to Lam or anyone else inside.

{¶ 47} The parties stipulated that the marijuana located under the air mattress weighed 883.85 grams. The two baggies of crack cocaine from the dresser in the southwest bedroom weighed 1.32 grams and 0.08 grams, respectively. The crack cocaine from the closet weighed 208.88g.

{¶ 48} At the conclusion of the State's case, Lam moved for an acquittal pursuant to Crim.R. 29. The trial court denied the motion.

{¶ 49} Construing the evidence in the light most favorable to the State, the trial court did not err in denying Lam's Crim.R. 29 motion. Based on the State's evidence, a jury could have reasonably concluded that the southwest bedroom belonged to Lam and that the location of the drugs within the room indicated that the drugs belonged to him.

{¶ 50} The defense called two witnesses on Lam's behalf: Nicole Herron, Lam's girlfriend, and Donald Fitzwater III, his cousin. Herron testified that she had been Lam's girlfriend for three years (at the time of trial) and had met Lam in November 2011. Herron testified that Lam was arrested in December 2011 at his "mom's house." Herron had spent a couple of nights there before Lam's arrest, but she did not like being there. She

stated that the house was always full of "a lot of people," including "too many males." Herron stated that she and Lam spent three to four nights per week together, but she had stayed at 645 Creighton a total of only two or three times. Although she testified at the suppression hearing and described the bedroom in which she and Lam stayed (the one with the air mattress), there was no similar testimony at trial. On December 11, 2011, the night before Lam was arrested, Lam had spent the night at Herron's residence.

{¶ 51} Donald Fitzwater, who was 19 years old when Lam was arrested, testified that he often went to 645 Creighton after school and his sporting events. Fitzwater stated that Lam was hardly ever at 645 Creighton, and that Lam usually slept on the couch on the first floor when he did. Lam spent most nights at Herron's house or his (Fitzwater's) house. In 2011, Fitzwater spent time at 645 Creighton with Timothy, not with Jeffrey Lam.

{¶ 52} Fitzwater further testified that many people had access to 645 Creighton Avenue. Fitzwater indicated that he had a house key and that he occasionally slept there; Fitzwater used the air mattress in the third bedroom when he did. Fitzwater had slept on the air mattress during the night of December 11, 2011, and left around noon on December 12 (the day Lam was arrested). Fitzwater testified that people went upstairs and into the basement "all the time" and that Timothy's friends would "crash" on the air mattress. Fitzwater stated that there were no locks or deadbolts on any of the bedroom doors.

{¶ 53} Considering all of the evidence at trial, the State presented sufficient evidence to support Lam's conviction, and Lam's conviction was not against the manifest weight of the evidence. The credibility of the witnesses and the weight to be given to

their testimony were matters for the jury, as the trier of fact, to determine. As stated above, the State presented evidence that the southwest bedroom was Lam's bedroom, and the room appeared to be "lived in," with "knickknacks" and clothes in the dresser and closet. Given the location of the drugs, the jury could have reasonably concluded that Lam constructively possessed the drugs in the southwest bedroom. The jury also could have reasonably concluded, as defense counsel argued, that the State had not proven that Lam constructively possessed the drugs in the southwest bedroom, but the jury did not lose its way when it determined otherwise.

{¶ 54} Lam's first and second assignments of error are overruled.

### III. Ineffective Assistance of Counsel

{¶ 55} Lam's third assignment of error states: "APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL'S FAILURE TO OBJECT AND FACILITATING INTRODUCTION OF HEARSAY EVIDENCE; FAILING TO OBJECT TO THE STATE'S IMPROPER ARGUMENT; AND FAILING TO EFFECTIVELY CROSS-EXAMINE WITNESSES."

{¶ 56} Lam claims that his counsel rendered ineffective assistance in three general respects. First, Lam cites several instances where defense counsel failed to object to alleged hearsay testimony indicating that Lam resided at 645 Creighton Avenue. Second, Lam argues that counsel should have objected to the prosecutor's closing argument that the southwest bedroom belonged to Lam. Third, Lam claims that his defense counsel "facilitat[ed] testimony" that the southwest bedroom belonged to Lam. We need not address these specific arguments, because we conclude that counsel's actions were based on a reasonable trial strategy.

{¶ 57} To establish ineffective assistance of counsel, Lam must demonstrate both that trial counsel's conduct fell below an objective standard of reasonableness and that the errors were serious enough to create a reasonable probability that, but for the errors, he would have been granted a new trial. *See Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland*, 466 U.S. at 688. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992); *State v. Rucker*, 2d Dist. Montgomery No. 24340, 2012-Ohio-4860, ¶ 58.

{¶ 58} Defense counsel's strategy at trial focused on the facts that Lam seldom used the southwest bedroom at 645 Creighton and that others routinely had access to and used that room. During opening statements, defense counsel stated:

* * * There were three bedrooms in the home upstairs, their mom's, Jeffrey did have a bedroom behind his mom's; his mom's was the – the evidence will show is this one right here, behind it was Jeffrey's, the bedroom there was Timothy's, behind that is a bathroom.

But the evidence will also show that in the days and weeks prior to December 12th, 2001, Jeffrey hadn't spent a whole of time in that home. In fact, the evidence is going to show the only furniture in Jeffrey's bedroom was an air mattress and a dresser.

But the evidence will only [sic] show that a number of other people had access to that home, both on December 12th, 2011, and in the days before it.

(Tr. at 118-19.)

{¶ 59} Defense counsel acknowledged in his opening statement that the police found drugs "all over the house," including "Jeffrey and Timothy's bedroom[s]." Counsel argued, however, there were was no physical evidence that "tie[d] those drugs to Jeffrey Lam." Counsel emphasized that the police did not collect the personal items found in the bedroom, and they had no DNA evidence or fingerprint evidence tying the items in Jeffrey's bedroom to him. (Tr. 119-121) Counsel concluded his opening statement, saying:

Ladies and gentlemen of the jury, on December 12, 2011, a substantial amount of drugs were found in the home at 645 Creighton Avenue, Dayton, Ohio. A home that Jeffrey Lam sometimes stayed in. Because of that fact, Jeffrey Lam is charged with knowingly obtaining, possessing, or using those drugs.

Listen to the evidence as it's presented. Listen to the evidence regarding all the people that had access to Jeffrey Lam's bedroom that day and earlier. And I would assert to you, ladies and gentlemen, there will be no evidence that there was a lock on the door, or that it was locked, that there was a lock on the closet. Listen to the evidence, and ask yourself as the case unfolds, are you firmly convinced that the marijuana and crack found in that bedroom belonged to Jeffrey Lam.

{¶ 60} Each of Lam's claimed instances of ineffective assistance relates to defense counsel's strategy to concede that the southwest bedroom was Lam's and to argue, instead, that given the number of people who had access to and used the bedroom, Lam's possession of the drugs in the southwest bedroom should not be inferred from "mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." *See* R.C. 2925.01(K). Trial counsel's actions were consistent with his trial strategy.

{¶ 61} Trial counsel cross-examined the police-witnesses regarding other people's abilities to access the southwest bedroom and whether the items within the bedroom were Lam's. In particular, the police were asked whether the bedrooms were locked or had deadbolts, whether the police had collected clothing and personal items from the southwest bedroom or noted whether the clothing would fit Lam, and whether items within the bedroom were fingerprinted and photographed. Counsel elicited testimony that the southwest bedroom had an air mattress, implying more transient usage, whereas the other two bedrooms had standard beds. Counsel emphasized that the letter addressed to Lam at the Creighton address was dated several months before the arrest and was the only tangible item that expressly linked Lam to the bedroom. Counsel also called two witnesses to testify that Lam rarely slept at 645 Creighton and that others not only had access to his bedroom, but that Donald Fitzwater and Timothy's friends slept in Lam's bedroom, including on the night before Lam's arrest. Lam was arrested in a different room of the house, and no drugs were recovered from Lam personally on December 12, 2011. We find trial counsel's strategy to be reasonable.

{¶ 62} We note that, even without express testimony that Lam lived in the

residence and that the southwest bedroom was Lam's, the State presented some evidence from which the jury could have reached that conclusion. Officer Saylors properly testified that he knew from a past incident that Jeffrey Lam lived at the Creighton residence with his brother and mother and that they had resided there for a "couple months" and "it's less than a year." As stated above, the home had three bedrooms; officers' testimony established that two of those bedrooms clearly belonged to Timothy Lam and Cheryl Fitzwater. The remaining bedroom had the letter addressed to Lam. Accordingly, even without the alleged hearsay statements, the jury could have inferred that Lam resided at 645 Creighton and used the southwest bedroom.

{¶ 63} Upon review of the record, we find no basis to conclude that counsel's performance at trial was deficient. Lam's third assignment of error is overruled.

## IV. Motion for New Trial

{¶ 64} Lam's fourth assignment of error claims that the trial court "erred in overruling [his] motion for a new trial and failing to hold a hearing."

{¶ 65} On August 15, 2014, after the jury found him guilty but before sentencing, Lam filed a motion for a new trial based on newly discovered evidence, pursuant to Crim.R. 33(A)(6). Lam stated that he had received an affidavit from his brother, Timothy, which stated:

1. I am 18 years of age and am competent to make the statements herein.

2. On 12-12-11 the drugs that were found on the premises of 645 Creighton Ave., Dayton, Ohio 45410, belonged to me.

3. I stashed the drugs and the money, that was found, in Jeffery Lam's room.

4. Jeffery Lam was oblivious that there was drugs in the house. Due to being scared/nervous, I never confessed to anyone, including Jeffery Lam, that the drugs and money that was found belonged to me.

**{¶ 66}** In his motion for a new trial, Lam noted that the defense had disclosed to the State two previous handwritten letters received from Timothy Lam. The first was received in August 2013, in which Timothy claimed that the drugs in Lam's bedroom, specifically "2 pounds of weed and the bookbag with 7 ounces in a crown royal bag," were his (Timothy's). Timothy stated that he panicked when the police were kicking the front door of the house and that he had hidden the drugs in his brother's bedroom. Timothy stated in his letter that it was not right for his brother to be prosecuted because of him.

**{¶ 67}** In the second letter, dated March 16, 2014, Timothy stated that he had lied in the August 2013 letter and that he did not know whose drugs they were. Timothy indicated that he was not going to serve 3 to 11 more years in prison for something that was not his. Timothy concluded, "I don't know who sh*t it was but it wasn't mine."

**{¶ 68}** The State opposed Lam's motion. It argued that Timothy's August 2014 affidavit lacked credibility and was not grounds for a new trial. The State argued that the affidavit should be viewed "with significant skepticism after considering the inconsistencies in Timothy's previous letters. Moreover, the fact that the affidavit was completed a week after the Defendant's guilty verdict reinforces its dubious nature." The State also emphasized that the author of the affidavit, Timothy, was Lam's younger brother and co-defendant. Finally, the State argued that the affidavit should not be considered newly-discovered evidence, as Timothy's pro-defense assertions were made in his first letter to defense counsel. The State noted that Timothy was subpoenaed and

available for trial, but was not called as a witness.

{¶ 69} On October 19, 2014, the trial court overruled Lam's motion for a new trial "for reasons set forth in State's Memorandum."

{¶ 70} Under Crim.R. 33(A)(6), the trial court may grant a defendant's motion for a new trial "[w]hen new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial."  That provision further provides:

> When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing on the motion, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as is reasonable under all the circumstances of the case. The prosecuting attorney may produce affidavits or other evidence to impeach the affidavits of such witnesses.

{¶ 71}  "To warrant the granting of a motion for new trial in a criminal case, based on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence."  *State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370 (1947), syllabus.

{¶ 72} We review the trial court's decision on a motion for a new trial, pursuant to

Crim.R. 33, for an abuse of discretion. *State v. Lenoir*, 2d Dist. Montgomery No. 26080, 2015-Ohio-1045, ¶ 16. " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable. It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." (Citations omitted.) *State v. Mitchell*, 2014-Ohio-5070, 21 N.E.3d 1124, ¶ 13 (2d Dist.).

{¶ 73} The affidavit upon which Lam based his motion was attached to his motion for a new trial, and the trial court was free to evaluate the credibility of that affidavit. The State did not produce any affidavits to impeach Timothy Lam's affidavit, but it filed an opposition memorandum, which included copies of Timothy's two letters to defense counsel, and indicated why the State believed Timothy's affidavit did not provide grounds for a new trial for Lam. *See State v. Fricke*, 2015-Ohio-3389, __ N.E.3d __, ¶ 52 (2d Dist.).

{¶ 74} Although Timothy's affidavit was produced after the jury's verdict, the trial court could have reasonably concluded that the information was not newly discovered. Timothy's first letter to defense counsel, received in August 2013, expressed that Timothy was the owner of the drugs found in Lam's bedroom. Although Timothy recanted that statement in his second letter, defense counsel was aware of the first letter's statements prior to trial. Defense counsel could have called Timothy as a witness to question him about the ownership of the drugs found in Lam's bedroom.

{¶ 75} Moreover, the trial court could have reasonably determined that the affidavit was not credible. "Credibility evaluation is an important function of triers of fact. In the context of motions for new trial, a trial court is the trier of fact who must decide if

there is a strong probability of a different result. As one example, the need for trial court evaluation of credibility of new evidence is particularly apparent in situations of witness recantation." *State v. Lawrence*, 2d Dist. Montgomery No. 25623, 2014-Ohio-417, ¶ 35.

**{¶ 76}** It is apparent from the record that the trial court was aware that Timothy was Lam's brother and that Timothy was a co-defendant in the case, having also been charged with drug possession. The court could have reasonably concluded that Timothy's inconsistent statements in his letters to defense counsel and in the affidavit undermined the affidavit's credibility. The timing of the affidavit – coming approximately two weeks after the guilty verdicts in Lam's case – could have further raised doubts about the affidavit's credibility, particularly when Timothy could have, but did not, testify at trial.

**{¶ 77}** The trial court did not abuse its discretion in denying Lam's motion for a new trial. The fourth assignment of error is overruled.

### V. Conclusion

**{¶ 78}** The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

DONOVAN, J., concurs.
WELBAUM, J., concurring.

**{¶ 79}** I concur with the majority except for its conclusion that Officer Beane's act of flipping the air mattress exceeded the scope of the protective sweep performed at 645 Creighton Avenue. Specifically, I disagree with the majority's finding that there was insufficient evidence provided regarding the placement and appearance of the air mattress from which to conclude that Officer Beane reasonably believed that someone could have been hiding there.

**{¶ 80}** Nicole Herron, Lam's girlfriend, testified that the air mattress at issue was not standard, but a "double queen" that looked like there were two mattresses as opposed to just one sitting on the floor. Trans. Vol. I (July 17, 2013), p. 11. Herron testified that the air mattress was against the wall in a corner of Lam's bedroom and that it was covered with sheets and a comforter that did not touch the floor. *Id.* at 12 and 14-15. While she testified that it was apparent the bed was an air mattress sitting on the floor, she admitted that given the location of the air mattress, there was potential for a gap to form between the air mattress and the wall. *Id.* at p. 17. Herron also admitted that it was possible for such a gap to be covered by pillows and bedding. *Id.*

**{¶ 81}** The foregoing testimony indicates that it would be possible for someone to hide between the air mattress and the wall given that the air mattress was a double queen, which has greater height than a single air mattress, and given that the air mattress was located in a corner beside a wall and covered with bedding. Accordingly, I believe there was sufficient evidence provided regarding the placement and appearance of the air mattress to conclude that Officer Beane's act of flipping the air mattress was authorized during the protective sweep.

. . . . . . . . . . . . .

Copies mailed to:

Kirsten A. Brandt
James S. Armstrong
Hon. Gregory F. Singer